AG ROUTE SEVEN PARTNERSHIP,
et al., Plaintiffs,

and

Federal Deposit Insurance Corporation,
Substituted Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–534 C.

United States Court of Federal Claims.

July 29, 2003.

James H. Falk, Jr., Washington, D.C., attorney of record for plaintiffs AG Route Seven Partnership, et al.

Gary A. Kuiper, Washington, D.C., attorney of record for plaintiff Federal Deposit Insurance Corporation.

Jeffery T. Infelise, Washington, D.C., with whom was Stuart E. Schiffer, Deputy Assistant Attorney General, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### I. INTRODUCTION

The above-entitled matter is duly categorized as a *Winstar*-related[1] case. Plaintiffs herein are private investors ("private plaintiffs") who became shareholders of Surety Federal Savings & Loan Association, FSA

---

1. *United States v. Winstar Corp.*, 518 U.S. 839,     116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

("New Surety"), and the Federal Deposit Insurance Corporation ("FDIC"), as substituted plaintiff and receiver for New Surety. In separate complaints, both the private plaintiffs and the FDIC allege breach of contract and Fifth Amendment taking and due process claims against the government due to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").[2]

Since its filing on August 8, 1995, this case has amassed a panoply of motions, responses and reply briefs due, in part, to the earlier case management procedure employed by the then Chief Judge of the court.[3] Upon reassignment of subject case to the presiding judge,[4] a status conference was held on January 30, 2003, where all parties appeared in open court, to determine the status of ten (10) procedural motions and eight (8) dispositive motions. As stipulated at said status conference, and pursuant to the January 31, 2003 Order issued by this court, the following dispositive motions are presently pending before this court and awaiting decision:

(i) Private plaintiffs' April 3, 1998 short-form motion for partial summary judgment as to liability; (ii) Defendant's July 9, 1998 motion to dismiss; (iii) Plaintiff FDIC's October 10, 2000 motion for partial summary judgment on liability; (iv) Defendant's October 10, 2000 motion to dismiss all non-contract claims of private plaintiffs and plaintiff FDIC and motion (and cross-motion) for summary judgment on all contract claims; (v) Private plaintiffs' December 18, 2000 and plaintiff FDIC's January 12, 2001 respective cross-motions for summary judgment; and (vi) Defendant's February 7, 2003 motion to dismiss private plaintiffs.

2. *See* Pub.L. No. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464).

3. *See S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 52 Fed.Cl. 531, 537–39 (2002) (providing a thorough account of the case management procedure).

4. This case was re-assigned to the presiding judge on January 2, 2003.

5. Capital credits were cash contributions from the FSLIC. *See Winstar*, 518 U.S. at 853, 116 S.Ct. 2432.

For reasons set forth below, the court: (i) *Dismisses* private plaintiffs' April 3, 1998 short-form motion for partial summary judgment as to liability, as moot; (ii) *Grants*, in part, defendant's July 9, 1998 motion to dismiss, as to FDIC's lack of standing, and *Dismisses*, in part, as to private plaintiffs, as moot; (iii) *Dismisses* plaintiff FDIC's October 10, 2000 motion for partial summary judgment on liability; (iv) *Grants*, in part, defendant's October 10, 2000 motion to dismiss the non-contract claims of plaintiff FDIC, *Dismisses*, in part, as moot, the non-contract claims of private plaintiffs, and *Dismisses*, as to the FDIC and private plaintiffs, as moot, defendant's motion (and cross-motion) for summary judgment as to contract liability; (v) *Dismisses*, as moot, both the private plaintiffs' December 18, 2000 and plaintiff FDIC's January 12, 2001 respective cross-motions for summary judgment; and (vi) *Grants* defendant's February, 7, 2003 motion to dismiss private plaintiffs, as to all contract and non-contract claims.

## II. BACKGROUND

In 1996, the Supreme Court ruled that the enactment of FIRREA was the impetus for the government's breach of contract, whereby the government entered into agreements with healthy thrifts to acquire failed or ailing thrifts with assistance from the government. The various forms of government assistance in these *Winstar*-type agreements included capital credits,[5] notes, favorable accounting treatment and/or regulatory forbearance. What has proven to be most damaging to the government, however, are those instances where the government permitted the use of "purchase method" or "push down" accounting to create "supervisory goodwill," [6] along with regulatory forbearance.

6. "Purchase method" accounting enabled a healthy thrift acquiring a troubled thrift to off-set the negative excess value of liabilities over assets by creating an intangible asset styled "supervisory goodwill," whereby the emerging thrift was permitted to amortize the goodwill asset for a period of up to forty (40) years. *Winstar Corp. v. United States*, 64 F.3d 1531, 1535–36 (Fed.Cir. 1995). In the case here at bar, the amortization period was for twenty-five (25) years.

FIRREA, through its implementing regulations, patently precluded the emerging thrifts from (i) applying "supervisory goodwill" toward their "tangible capital" requirement, (ii) including any portion of "supervisory goodwill" in their "core capital" ratio beyond a three-year phase-out period, and (iii) operating outside of the regulatory safety and soundness requirements for thrifts, all of which was in direct contravention to the government's prior agreements.

By the time FIRREA was enacted, hundreds of such agreements had been consummated with the government.[7] Needless to say, both preceding and following the Supreme Court's ruling in *Winstar*, scores of complaints alleging injury from the government's breach of other *Winstar*-type contracts saturated the dockets of federal courts, the U.S. Court of Federal Claims in particular, in one phase of adjudication or another.[8] This case is among them.

While the private plaintiff shareholders initially filed suit in their individual and derivative capacities, the FDIC as receiver for New Surety entered the lawsuit in March 1997 as a substitute plaintiff for New Surety, thus subrogating private plaintiffs' claims as derivative shareholders. The private plaintiff shareholders allegedly negotiated through National Capital Group, Inc. ("NCG")[9] with the government for the acquisition of Surety Federal Savings and Loan Association ("Old Surety"), an ailing thrift.

In order to facilitate the acquisition, however, a new thrift was formed, to wit, New Surety, into which substantially all of the assets and liabilities of Old Surety were transferred. Upon the creation of New Surety and said transfer from Old Surety, the government granted to New Surety favorable accounting treatment, *i.e.*, creation and amortization of supervisory goodwill, and regulatory forbearance for three (3) years.

Historically, Old Surety was founded in 1925 as a state chartered thrift under the laws of North Carolina. Some thirty (30) years later, Old Surety became a stock thrift association and a member of the Federal Home Loan Bank system. By all accounts, Old Surety appeared to have been a healthy thrift until November 1983 when it came to light that the then chief financial officer had engaged in unauthorized futures contracts trading, which caused the thrift to suffer over $14 million in losses. Public disclosure thereof led to the subsequent withdrawal of approximately twenty-five (25) percent of the thrift's account deposits during 1983 and 1984. The financial strength of the thrift continued to weaken into 1985 and 1986 such that by September 30, 1987, Old Surety had a negative net worth of approximately $8.8 million.

As early as February 1984, the Federal Savings and Loan Insurance Corporation ("FSLIC") began soliciting bids for the acquisition of Old Surety.[10] In so doing, the FSLIC expressed a strong preference for bid proposals that did not include cash assistance from the government.[11] The December 1986 bid proposal of the NCG investor group was one such proposal, whereby the investor group would infuse a minimum of $4.2 million of private capital into a new thrift. That new thrift, in turn, would acquire Old Surety and the government would provide certain accounting favors (*i.e.*, push-down accounting and amortization of the intangible goodwill asset) and regulatory forbearance with respect to the newly formed thrift to enable it to emerge as a viable entity. Although the FSLIC did not accept the NCG investor

---

7. See *Winstar*, 518 U.S. at 844–58, 116 S.Ct. 2432, for a thorough account of the operating climate of the thrift industry during the 1980s.

8. *See Landmark Land Co., Inc. v. United States*, 256 F.3d 1365, 1370 (Fed.Cir.2001).

9. NCG is the merchant banking firm that assembled the investor group, and has represented itself as the point negotiator on behalf of the investor group (itself included among that group). NCG is present in this action as a share-

holder of New Surety, *i.e.*, one of 71 remaining private plaintiffs.

10. *See* Memorandum dated April 3, 1987 detailing FHLBB's efforts to market Old Surety. Pl. App. 2.

11. In many other instances, the government had provided cash assistance in the acquisition of failed or ailing thrifts, *see Winstar Corp.*, 64 F.3d at 1536, but by this time, it had begun scaling back on that form of assistance.

group's bid proposal at that time, it would later implore the group to re-submit its bid. NCG did so in September 1987, and said bid was subsequently approved by the FHLBB.

And so it came to be, effective on December 11, 1987, New Surety was formed on the bases that the NCG investor group infused $4.2 million in cash into New Surety for the acquisition of all of its capital stock. New Surety then acquired substantially all of the assets and liabilities of Old Surety in addition to receiving accounting favors and regulatory forbearance from the government. At the time of the acquisition, the fair market value of the liabilities of Old Surety exceeded the fair market value of its assets by approximately $12.2 million. The use of the push-down accounting method thus created $12.2 million in supervisory goodwill. Application of the supervisory goodwill as an intangible asset enabled the total cash infused by the shareholders, to wit, $4.2 million on the date of formation, to be recorded as a direct credit to New Surety's net worth, resulting in a positive net worth position.

Notwithstanding the foregoing, after the passage of FIRREA in 1989, New Surety immediately fell out of regulatory compliance. That is, New Surety's net worth plummeted to a negative position due to the loss of the government's favorable accounting treatment toward supervisory goodwill and regulatory forbearance. New Surety was required to submit a new capital plan demonstrating how it proposed to meet all regulatory safety and soundness requirements then in effect. When New Surety's proposed capital plan was rejected by the government, it was forced into receivership in July 1991.

Private plaintiffs brought a cause of action in their individual and derivative capacities in August 1995 alleging (1) breach of contract, (2) Fifth Amendment taking of plaintiffs' property without just compensation, (3) taking in violation of Fifth Amendment due process, and (4) in their April 1997 amended complaint, appending cross-claims against plaintiff FDIC for any recovery under the FDIC's claims herein. The relief sought: (i)

a declaration of contract breach and taking, (ii) damages for breach (plus interest), (iii) compensation for taking (plus interest), (iv) damages for deprivation of property without due process (plus interest), (v) in the alternative, restore plaintiffs to their *status quo ante*, and (vi) attorney's fees, costs, and interest.

When the FDIC intervened in March 1997 as substitute plaintiff for New Surety, it alleged (1) breach of contract and (2) Fifth Amendment taking and due process claims. The requested relief was: (i) a declaration of contract breach and taking, (ii) compensation for loss of going concern value and consequential damages resulting from closure of New Surety, (iii) compensation for all monies expended and costs incurred by FDIC, and for the value of all benefits conferred on the government, and (iv) costs, interest, and attorney's fees.

The issues thus to be decided herein are: (1) whether this court has jurisdiction over the private plaintiffs' contract claims, (2) whether a contract, either express or implied-in-fact, existed with the government, (3) if so, who are the parties thereto, (4) whether there was a contract breach by the government, (5) if so, whether a Fifth Amendment taking resulted from that breach, (6) whether this court has jurisdiction over private plaintiffs' cross-claims against plaintiff FDIC, and (7), whether this court has jurisdiction over plaintiffs' Fifth Amendment taking and due process claims.

## III. DEFENDANT'S MOTION TO DISMISS PRIVATE PLAINTIFFS

In defendant's February 7, 2003 motion to dismiss private plaintiffs,[12] the government contends that the: (i) private plaintiffs were not in privity of contract with the government, and therefore their contract claim must fail pursuant to 28 U.S.C. § 1491(a), the court's jurisdictional statute; (ii) private plaintiffs are not third-party beneficiaries to any contract with the government; (iii) private plaintiffs lack standing to maintain a

---

12. Defendant's February 7, 2003 motion to dismiss private plaintiffs was intended to supplant portions of its July 9, 1998 motion to dismiss, and October 10, 2000 motion to dismiss all non-contract claims of private plaintiffs.

shareholder derivative claim; (iv) AG Route Seven Partnership should be dismissed for all purposes; (v) court lacks jurisdiction over private plaintiffs' cross-claims against the FDIC; (vi) private plaintiffs' Fifth Amendment taking claim is foreclosed as a matter of law; and (vii) court lacks jurisdiction over private plaintiffs' Fifth Amendment due process claim.

### A. Jurisdiction

As a threshold matter, this court must determine its jurisdiction to entertain a cause of action. It is well settled that the federal government may not be sued absent an express waiver of its sovereign immunity. *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). At 28 U.S.C. § 1491(a)(1), the Tucker Act furnishes such an express waiver as well as grants this court the power to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied-in-fact contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

Instead, however, of creating a substantive right of recovery against the government, the Tucker Act merely prescribes the jurisdictional scope of this court. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Hence, in order to go forward with a claim against the government pursuant to the Tucker Act, the claimant must concurrently plead a substantive right to monetary relief based upon a specific federal law or statute, or an express or implied-in-fact contract with the government. *Id.* The private plaintiffs herein have so alleged the breach of a contract with, and Fifth Amendment Constitutional violations by, the government.

### B. Standard of Review

Defendant, however, challenges private plaintiffs' pleading under a RCFC 12(b)(1)

motion to dismiss for lack of subject matter jurisdiction, contending that private plaintiffs lack the requisite privity of contract with the government. Challenges to subject matter jurisdiction may be raised at any time, even on appeal, by either the parties or the court *sua sponte*. *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd*, 281 F.3d 1376 (Fed.Cir.2002).

Private plaintiffs argue that defendant's RCFC 12(b)(1) motion must be denied as a matter of law, because privity of contract is not properly raised as a challenge to the court's power to *hear* a claim. Rather, the question of privity should be a challenge on the *merits* under a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted.

There is binding authority from the Federal Circuit to support the views of both parties. *See Maniere v. United States*, 31 Fed. Cl. 410, 413–15 (1994) (examining a majority and minority view). The *Maniere* court felt constrained to follow the so-called majority view as applied by the Federal Circuit *en banc* in *Cruz v. Department of Navy*, 934 F.2d 1240, 1247 (Fed.Cir.1991).[13] Such majority view or "factual attack doctrine allows the moving party to dispute [the factual] allegations [of jurisdiction in a complaint] if the pleader is allowed a full opportunity to respond." *Total Medical Mgmt., Inc. v. United States*, 29 Fed.Cl. 296, 300 (1993).

This court embraced the view that a challenge to a claimant's contract privity is properly raised by a Rule 12(b)(1) challenge to subject matter jurisdiction in *Martinez*, 48 Fed.Cl. at 856–57, which was affirmed by the Federal Circuit. Said challenge is particularly apposite where "[t]he government consents to be sued only by those with whom it has privity of contract," and no others. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998) (quoting *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984)). Privity of contract, arguably a merits issue, is "inextricably intertwined" with the government's express waiv-

---

**13.** "In such circumstances, pursuant to *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir.1982), this Court maintains no discretion to apply any law in conflict with that as recited by

the binding precedent of the United States Court of Claims, the United States Court of Customs and Patent Appeals, or the *en banc* rulings of the Federal Circuit." *Maniere*, 31 Fed.Cl. at 415.

er of sovereign immunity which forms the basis for this court's jurisdiction. *See Total Medical Mgmt.*, 29 Fed.Cl. at 300. Therefore, defendant's Rule 12(b)(1) motion is properly before us.

Ordinarily when reviewing a Rule 12(b)(1) motion, the uncontested allegations of the pleader are taken as true and construed in a light most favorable to the non-movant. *Martinez*, 48 Fed.Cl. at 856. However, the non-movant may not rest on mere allegations once the facts alleging jurisdiction are challenged. *Id.* at 857 (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988)). Instead, the non-moving party must present additional facts and/or other evidence outside of the pleadings to prove the court's subject matter jurisdiction by a preponderance of the evidence. *Id.* On a Rule 12(b)(1) motion to dismiss, the court may find facts [14] necessary to satisfy itself of the proper exercise of jurisdiction. *Id.*

The inquiry to be proved to overcome a Rule 12(b)(1) motion is two-fold: (i) whether a contract existed with the government, and (ii) whether private plaintiffs were parties thereto. *See Martinez*, 48 Fed.Cl. at 860. Alternatively, as to the second prong *supra*, we will determine whether private plaintiffs meet the exception to the privity requirement in order to establish jurisdiction. *See Maniere*, 31 Fed.Cl. at 416. "To avoid the privity requirement and demonstrate jurisdiction in this Court, a claimant may assert the status of a third-party beneficiary," which the private plaintiffs herein have done. *Id.* at 417 (citation omitted).

## C. Contract Privity

### 1. Direct Parties

■ On the one hand, private plaintiffs allege the formation of an express contract with the government, whereby they and the government entered into an Acquisition Agreement. Plaintiffs further contend that the incorporation clause of the Acquisition Agreement incorporates by reference several other documents, including the FHLBB Res-

olutions and a Forbearance Letter, which were executed contemporaneously with the Acquisition Agreement, and collectively constitute an "integrated contract" between the private plaintiffs and the government.

On the other hand, the government has predicated its challenge to private plaintiffs' privity of contract on the ground that it was not private plaintiffs, but New Surety, that entered into the Acquisition Agreement with the government. Defendant is correct, and that fact alone is fatal to private plaintiffs' express contract claim. The opening paragraph of the Acquisition Agreement plainly and expressly states:

> "THIS AGREEMENT is made and entered into this 11th day of December, 1987, by and between the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION ('FSLIC'), in its capacity as Receiver for [Old Surety], ... and SURETY FEDERAL SAVINGS AND LOAN ASSOCIATION, FSA ... ('ACQUIRING ASSOCIATION')."

Pl.App. 6 at 1.

Moreover, the existence of an incorporation or "Entire Agreement" clause does not cure the obvious omission of private plaintiffs as named parties to the Acquisition Agreement between New Surety and the government. The same argument premised on an incorporation clause was rejected in *Home Savings of America, F.S.B. v. United States*, 51 Fed.Cl. 487, 497 (2002), where, on similar facts, that court found that the Entire Agreement clause, though incorporating other documents by reference, "did not purport to bring in wholly new parties ... to the assistance agreements." We reach the same conclusion in the case *sub judice* especially in light of the sole benefit clause contained in the Acquisition Agreement which reads in its entirety:

> "It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it and all conditions and provisions of it are for the sole benefit of the [FSLIC] and [New Surety] and for the benefit of no

---

**14.** Factual findings made by this court are given "considerable deference" on review, and may only be overturned upon a determination of

"clearly erroneous." *See Hendler v. United States*, 175 F.3d 1374, 1378 (Fed.Cir.1999).

other person. Nothing expressed or referred to in this Agreement is intended to or shall be construed to give any person other than the [FSLIC] or [New Surety] any legal or equitable right, remedy or claim under or with respect to this Agreement or any of its provisions."

Pl.App. 6 at 10. The foregoing clause unequivocally and unmistakably precludes the private plaintiffs from establishing an express contract with the government *vis a vis* the Acquisition Agreement.

Although the private plaintiffs' claim of an express contract with the government fails, the court may examine whether they are parties to an implied-in-fact contract. *See Martinez,* 48 Fed.Cl. at 860. *See also Home Savings,* 51 Fed.Cl. at 497–98 (finding that "Plaintiffs' better argument is that the assistance agreement is only one part of a larger transaction to which Ahmanson was a party—namely, a separate, implied-in-fact agreement with FHLBB at the time Ahmanson sought approval of its acquisitions, through Home Savings, of the target banks."). An implied-in-fact contract may exist "if there is a meeting of the minds which can be inferred from the parties' conduct showing, in light of the surrounding circumstances, a tacit understanding [of an agreement] between them." *Martinez,* 48 Fed.Cl. at 860 (citations omitted).

■ The elements of an express or implied-in-fact contract with the government are the same. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). There must be—(1) mutuality of intent to contract, (2) lack of ambiguity of an offer and acceptance, (3) consideration, and (4) actual authority of the government agent to bind the government. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). Plaintiffs have specified four (4) documents which form the basis for an "integrated contract" with the government: (i) the December 11, 1987 FHLBB Resolution, signed by the secretary of the FHLBB; (ii) the Acquisition Agreement, signed by agents for New Surety and FSLIC; (iii) the Forbearance(s) Approval Letter, signed by the assistant sec-

retary of the FHLBB; and the Additional Infusion of Capital Stipulation, signed by agents for NCG and New Surety.

### a. Mutuality of Intent

■ It is undisputed that the FSLIC actively and relentlessly "shopped," from 1984 to 1987, for the acquisition of Old Surety, first in the local North Carolina market, then in the national market. The FSLIC pointedly sought bids that did not require cash assistance from the government, but instead proposed to bring in new private capital. In December 1986, NCG submitted a bid proposing to infuse $4.2 million in private capital, but was unable at that time to raise the capital, and its bid was rejected for that reason. After receiving no other viable bids, in 1987 the government asked NCG to resubmit its bid. NCG did so in September 1987.

NCG's 1987 bid was substantially the same as its 1986 bid with a notable exception—the 1986 bid contained a (partial) list of 28 interested investors, but the 1987 bid proposal was devoid of any mention of the identity of the potential investors, save NCG.[15] At all times, however, NCG held itself out as an interested private investor representing a group of other private investors.

Defendant argues that the deposition testimony of several of the private plaintiffs reveals that they either (i) were not aware that they had entered into any contract with the government, or (ii) did not believe they had done so. But that is not the test. "It is neither necessary nor practical to enter the minds of the parties." *City of El Centro v. United States,* 16 Cl.Ct. 500, 506 (1989). The test is whether "the parties' conduct indicates that plaintiff and defendant, in fact, took upon themselves *corresponding obligations and liabilities* and, viewed objectively, came to that meeting of the minds sufficient to establish an implied-in-fact contract." *Id.* at 508 (emphasis added). We find that they did not.

Clearly, the government's solicitation of Old Surety to potential acquirers can be

---

**15.** Only 14 of the 28 interested investors identified in the 1986 bid proposal were actually named among the 57 shareholders of record as of December 11, 1987. *See* Def.App. 34.

characterized as a request for offers. But NCG's bid proposal, in response to the government's request, fails as an offer because the bid contains proposed actions and obligations to be undertaken solely by New Surety. NCG, however, did not represent New Surety. Stated differently, NCG's bid proposal could not and did not create the power of acceptance in the government to contract with New Surety, when NCG lacked any legally recognizable authority to bind New Surety in contract.

These facts are distinguishable from those in *Home Savings* where Ahmanson was the holding company of Home Savings and, in fact, had the legal authority to make proposals/offers on behalf of Home Savings, and thus bind the thrift in contract.[16] NCG had no such authority respecting New Surety. As discussed *infra*, the facts before us constrain the court to conclude that there were no "corresponding obligations and liabilities" undertaken by or between the private plaintiffs and the government reflective of a meeting of the minds sufficient to form an implied-in-fact contract.

#### i. The Offer

The key to the court's ultimate finding that no implied-in-fact contract existed between the private plaintiffs and the government is understanding that the terms of NCG's bid proposal were two-fold: Part one, for the formation and capitalization of New Surety, and Part two, upon formation, New Surety would acquire substantially all of the assets and liabilities of Old Surety, in exchange for

the government's grant of accounting favors and regulatory forbearance to New Surety.[17]

Part one, the formation and capitalization of New Surety, was not an offer to contract, but instead a mere application to charter a new thrift. To be sure, NCG and the private investors needed a vehicle, *i.e.*, an artificial entity, to carry out the proposed acquisition of Old Surety. NCG's proposed plan was not to acquire Old Surety as a whole,[18] but rather to acquire substantially all of its assets and liabilities.[19] For obvious reasons, said acquisition could not be accomplished in the investors' individual capacities, particularly since they intended to be "passive investors only and [would] not participate in any manner in the day-to-day operations" of the thrift. Pl. App. 4 at 6.

Thus, there first had to be an acquiring thrift, hence private plaintiffs applied for the federal charter of a new thrift. However, upon the creation of the new thrift, to wit, New Surety, the law recognizes that entity as a legal "person" having separate legal rights, duties and obligations from its shareholder owners. The government *as regulator* required that *any* prospective acquiring thrift obtain new capital under the circumstances involving the acquisition of Old Surety, the ailing thrift. In its capacity as regulator, the government had every right to assess the capital position of a prospective acquiring thrift in order for said *thrift* to minimally qualify as a viable acquirer.

Part two, then, was the actual *would-be offer* which corresponded to the government's solicitation, to wit, that *New Surety* would acquire substantially all of the assets

16. *See also Hometown Financial, Inc. v. United States*, 53 Fed.Cl. 326, 328–31 (2002) (where the holding company, HFI, possessed the legal authority to bind the new thrift, New Hometown, in contract to merge with Old Hometown and receive the specified government assistance).

17. "Part one" and "Part two" are designations being made by the court for the clarity of its analysis. The actual NCG bid is not so delineated.

18. As did the private plaintiffs in *Bluebonnet Savings Bank, F.S.B. v. United States*, 43 Fed.Cl. 69, 73 (1999), *rev'd, on other grounds*, 266 F.3d 1348 (Fed.Cir.2001) ("The glue to this transaction is the agreement of the FSLIC to provide

cash assistance and certain forbearances in exchange for Mr. Fail's capital and management commitment.") and *La Van v. United States*, 53 Fed.Cl. 290, 300–01 (2002) ("[T]he undisputed facts plainly establish that Messrs. LaVan, Lullo, and Skozek were, as individuals, 'the acquirers' who negotiated with the FHLBB to purchase the converted federally-insured institution. These individuals were the direct purchasers who then became 'shareholders' in the new institution."), where individual shareholders were found to be in privity of contract with the government.

19. The foregoing was a tactical decision to cut-off any latent surviving rights of the shareholders of Old Surety.

and liabilities of Old Surety from the government—the value of the liabilities in excess of the value of the assets being the stated purchased price, *i.e.*, negative $12.2 million. Then, in exchange for the foregoing detriment to New Surety, the government would permit New Surety to apply favorable accounting treatment, to wit, push-down accounting, to off-set the negative asset-to-liability valuation, as well as certain regulatory forbearance. But that would-be "offer" of September 1987 was not being advanced by authorized representatives of New Surety.[20] NCG at all times held itself out to be representing a group of private investors who were interested in becoming "passive investors only," and not as representing New Surety. Therefore, NCG could not make any legally binding offer on behalf of New Surety.

### ii. The Acceptance

In that respect, the government's approval of the federal charter of New Surety was less of an acceptance of an offer, than an approval of an application to charter a new thrift and a bid proposal contingent upon the future acts of New Surety. If NCG negotiated with the government on behalf of the private investor group, it was for the formation of New Surety *only*. The Acquisition Agreement between the FSLIC and New Surety incorporates by reference FHLBB Resolution No. 87–1234p. Therein, the FHLBB approved the organization of New Surety as a condition precedent to the subsequent acquisition

by New Surety. Obviously without an acquiring thrift, there could be no acquisition.

Private plaintiff investors elected to become shareholders of a new thrift, so that said thrift could enter into an acquisition agreement with the government. The fact that the creation of a new thrift, and a subsequent acquisition undertaken by that thrift are closely related transactions, does not change the legal status of the participants in each. Private plaintiffs were merely seeking an investment opportunity. In the Private Placement Memorandum ("PPM") engineered by NCG, the potential investors were strongly advised that "THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK ...." Def.App. 8 at 76. Plaintiffs were further advised that the investment involved capitalizing a new thrift, New Surety, that would acquire the assets and liabilities of an ailing thrift, Old Surety, and even then, the new thrift would be dependent upon government assistance just to meet minimum regulatory standards.[21]

The foregoing disclosure respecting New Surety's dependence upon the government for its viability did not cause private plaintiff investors to become parties to any agreement between New Surety and the government. To the contrary, the disclosure merely served to place prospective investors on notice of the "HIGH DEGREE OF RISK" of the investment they might choose to undertake.[22] On these facts, this case is indistinguishable from the well established principle that mere shareholders lack the contractual obligations of the corporation, and therefore are not contract parties.[23]

---

**20.** In some instances, the incorporators of an artificial entity may have certain rights and obligations respecting the entity prior to its formation, yet directly connected thereto. That is, an incorporator may enter into agreements on behalf of the entity. In this case, however, the shareholder plaintiffs, including NCG, were not considered to be the incorporators of record for New Surety. Instead, the four members of the Board of Directors were elected by the FSLIC, as receiver for Old Surety, "as the sole organizer[s] of New [Surety]."

The record shows that three of the directors/organizers of New Surety became shareholders as well, to wit, Michael P. McCarthy, Jerry T. Norvell, Jr. and Jack C. Weir. Assuming *arguendo* that the use of the term "organizer" was intended to be synonymous with incorporator, these individuals did not purport to have been making

any offer to the government on behalf of New Surety, when in fact, they were not even recognized by the government as "organizer[s]" of New Surety until December 11, 1987.

**21.** *See* PPM, Def.App. 8 at 87–93.

**22.** By definition, a private placement or non-public offering is intended for "accredited" investors only. In this context, the term "accredited" refers to informed, sophisticated investors who have the capacity to protect their own interests as well as the financial fortitude to assume the high degree of risk involved in the offering. *See* 12 CFR § 563g.4.

**23.** *See First Hartford Corp. v. United States*, 194 F.3d 1279, 1289 (Fed.Cir.1999) ("Indeed, one of the principal motivations behind utilizing the

Clearly the substance of the communications between NCG and the government was that New Surety would emerge as a viable thrift. Substance over form reasoning, however, to find an implied-in-fact contract between the private plaintiffs and the government is not formidable in this case. Here, the particular form of each of the transactions was essential to carrying out the complexity of the structured plan. To wit, the government issued a new federal charter to New Surety; private plaintiffs infused into, *i.e.,* tendered to, *New Surety* $4.2 million; the appointed directors of New Surety authorized issuance and sale of 455,000 shares of stock [24] to plaintiffs; only then could *New Surety* acquire the assets and liabilities of Old Surety from the government and the government grant accounting favors and regulatory forbearance to New Surety.

Simply stated, private plaintiffs were not the acquirers of the assets and liabilities of Old Surety; New Surety was. In Part one of the bid proposal, private plaintiffs applied to the government for the formation of New Surety as a federal stock thrift, and proposed therein to capitalize it through acquiring all of its shares of stock. Accordingly, the only context in which private plaintiffs are referenced in any of the alleged contract documents are as the "Acquirers" of all of the stock of New Surety, as follows:

(1) FHLBB Resolution No. 87–1234p: "National Capital Group, Inc. ('NCG'), in connection with a bid to acquire [Old Surety], has applied for prior written approvals for it[self] and other private investors (collectively, the 'Acquirers') to acquire the stock of New [Surety]." Pl.App. 7 at 2;

(2) Acquisition Agreement: "The ACQUIRING ASSOCIATION [*i.e.,* New Surety] is a stock savings and loan association ... [and] is owned by a group of private investors, including National Capital Group, Inc." Pl.App. 6 at 1;

(3) Plan of Organization: "The Board shall ... Authorize the issuance and sale of up to Six Hundred Fifty–Five Thousand (655,000) shares of New [Surety] Common Stock to National Capital Group, Inc. ('NCG') and other private investors (collectively, the 'Acquirers')." Pl. FDIC App. 29 at 400; and

(4) September 1987 Bid Proposal: "[T]he individual Acquirers are passive investors only and will not participate in any manner in the day-to-day operations of New Surety." Pl.App. 4 at 6.

Part two, once New Surety came into existence, the entity, and not the private plaintiffs, entered into separate and exclusive transactions with the government: (1) for the transfer of substantially all of the assets and liabilities of Old Surety, and (2) for the grant of accounting favors and regulatory forbearance. Private plaintiffs are not named parties in any of the alleged contract documents—(i) the December 11, 1987 FHLBB Resolution No. 87–1234p was signed by the secretary of the FHLBB; (ii) the Acquisition Agreement was signed by agents for New Surety and the FSLIC; (iii) the Forbearance Approval Letter was addressed to New Surety and signed by the assistant secretary of the FHLBB; and (iv) the Additional Infusion of Capital Stipulation was signed by agents for NCG and New Surety.

The Additional Infusion of Capital Stipulation, though required by the FHLBB Resolution No. 87–1234p, was executed between NCG and New Surety, not the government, where NCG, alone, was acting in the capacity of a surety. Ideally, the strongest capital position for New Surety would have been to have raised $5.2 million on December 11, 1987. However, at the time of formation, only $4.2 million had been tendered by the

corporate form is often the desire to limit the risk of ownership to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation."); *see also Glass v. United States,* 44 Fed.Cl. 73, 79 (1999), *rev'd, in part, remanded, in part, on other grounds,* 258 F.3d 1349 (Fed.Cir.2001) ("The documentary evidence shows, however, that individually the four private plaintiffs did not contract for the treatment of goodwill resulting from the acquisition;

Sentry did. Sentry, of course, was subsumed as a result of the acquisition and the shareholders became controlling shareholders of Security. They are not parties to the contract.").

24. A total of 655,000 shares of stock were authorized, but the $4.2 million tendered on December 11, 1987 was for the purchase of 455,000 shares, net of NCG's expenses.

shareholders, therefore, New Surety needed a guarantee in the amount of $1 million to warrant the maintenance of its capital requirement. NCG opted to fulfill that role. Once New Surety sold an additional $1 million worth of stock, by February 1988, no doubt through NCG's continued marketing efforts, NCG was later relieved of its obligation as a surety.[25]

The fact that private plaintiffs' participation in Part one of the bid proposal, that is, the infusion of capital into New Surety, precipitated the government's willingness to transact with New Surety under Part two, does not transform these plaintiffs into parties to the separate agreements between the government and New Surety. Bottom line, there had to have been a thrift to bid on the acquisition of Old Surety since the prospective investors were not themselves intending to take over the management and operations of Old Surety. Private plaintiffs proposed to create said thrift.

The FHLBB addressed the creation of New Surety separately from the subsequent acts by New Surety through two separately titled sections in Resolution No. 87–1234p. The creation section was titled "Organization of New [Surety] Stock Association," and the acquisition section was titled "General Findings Concerning the Acquisition of Substantially All of the Assets and Liabilities of [Old Surety] by [New Surety]." Once New Surety was formed, the government in fact entered into separate agreements with New Surety. Inasmuch as the government may have later breached the agreements with New Surety, it is a matter between the government and New Surety, with all rights and remedies pursuant thereto accruing only to New Surety.

### b. Consideration

Here, too, an implied-in-fact contract between the private plaintiffs and the government fails. Consideration is "[s]omething of value (such as an act, a forbearance, or a return promise) received by a promisor from a promisee."[26] *See also Castle v. United States,* 301 F.3d 1328, 1339 (Fed.Cir.2002), finding that (i) negotiations and (ii) an exchange of promises are required to find direct party status for shareholder plaintiffs. Under the *Castle* two-part test, although private plaintiffs claim to have negotiated with the government through NCG, which is a tenuous argument in itself,[27] there was clearly no exchange of promises between private plaintiffs and the government.

Private plaintiffs, labeled as the "Acquirers" of the stock of New Surety, *tendered* approximately $4.2 million *to New Surety* for the capitalization of New Surety. The government entered into an Acquisition Agreement with New Surety to acquire the assets and liabilities of Old Surety to the detriment of New Surety, and in connection therewith, granted accounting favors and regulatory forbearance *for the sole benefit of New Surety.* In other words, "P" plaintiffs announced to "G" government regarding "T" New Surety the following: P will do X for T, if G will do Y for T, which is neither an exchange of promises nor consideration between P and G.

It could be argued that private plaintiffs conferred a benefit on the government by offering to form and capitalize a new thrift

---

25. Def.App. 33, FHLBB Resolution No. 89–1740 dated June 29, 1989 (modifying FHLBB Resolution No. 87–1234p dated December 11, 1987 "to no longer require NCG to provide an Irrevocable Stand-by Letter of Credit in favor of [New] Surety"); Def.App. 32, Letter dated July 14, 1989 from FHLBB (informing counsel for NCG, Inc. of FHLBB Resolution No. 89–1740).

26. *Black's Law Dictionary* 300 (7th ed.1999).

27. NCG has held itself out as, and the government accepted that NCG was, representing a group of private investors. But nowhere in the record is the identity of those private investors revealed during the time of the negotiations. The December 1986 bid proposal contained a partial list of 28 "interested investors," of which only 14 actually became shareholders. There was no such list contained in the September 1987 bid proposal which appears to be the proposal acted upon, and was referenced to, by the government (although both are substantially similar). At best, only 54 of the 71 private plaintiffs in this suit can even claim to have been present at the time of alleged contract formation, *i.e.,* those who had purchased shares by December 11, 1987. Those plaintiffs acquiring shares of stock after the date of alleged contract formation cannot be said to have negotiated, nor entered into any agreement, with the government.

into which the assets and liabilities of an ailing thrift could be transferred, thereby alleviating the government of the expense of liquidating said ailing thrift. If framed thus, then what did the government promise to the private plaintiffs? Private plaintiffs have not shown to the court the government's promise to them, or any other consideration tendered to, or otherwise conferred upon them, by the government. Rather, all promises made by the government were made to New Surety.

To accept private plaintiffs' characterization of an alleged contract between the government and themselves would cause New Surety to become a third-party beneficiary of such an agreement. But the analysis under that theory would still fail on the same element of consideration. There is simply no exchange of promises between private plaintiffs and the government that conferred a benefit upon, or constituted a detriment to, either party at the time of the alleged contract formation. The government's performance undeniably was for the benefit of New Surety, and its promises, *i.e.,* favorable accounting treatment and regulatory forbearance, were made to New Surety, not to the private plaintiff shareholders. Unquestionably, it was New Surety that incurred a detriment in relation to the negative asset-to-liability valuation of the Old Surety acquisition.

Given that there was no mutuality of intent, and furthermore a lack of consideration between private plaintiffs and the government, private plaintiffs' direct-party contract claim must fail.

### 2. Third-party Beneficiaries

■ Moreover, plaintiffs are not third-party beneficiaries to the agreement between the government and New Surety. The Court of Appeals for the Federal Circuit in *Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir. 2001) made it abundantly clear that "[i]n order to prove third party beneficiary status, a party must demonstrate that the contract

not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." More "specifically, … the contract must express the intent of the promisor to benefit the shareholder personally, independently of his or her status as shareholder." *Id.* at 1353–54. Private plaintiffs herein have made no such demonstration or showing to the court by directing the court's attention to any document or set of documents which convey any such express or implied intent, nor has the court itself uncovered the same in the record. Therefore, private plaintiffs' claim as third-party beneficiaries must also fail.

### 3. AG Route Seven Partnership as Assignee

■ Plaintiff AG Route Seven Partnership, as a mere assignee of shares of stock, cannot establish privity of contract with the government as a matter of law. According to the shareholder records of New Surety, Edward and Betty Schiff became shareholders of 2500 shares of stock on December 11, 1987. On June 1, 1991, for reasons unrelated to the instant cause of action, the Schiffs assigned those shares to AG Route Seven Partnership. We agree with both of defendant's contentions that (i) the assignment was invalid, and (ii) even if it were valid, the law is clear that assignees cannot establish privity of contract with the obligor.

Pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727(a) and (b), "An assignment may be made only after [1] a claim is allowed, [2] the amount of the claim is decided, and [3] a warrant for payment of the claim has been issued." It is clear from the facts in the case here at bar that none of the conditions for establishing a valid assignment claim against the government has occurred. Private plaintiffs offer no argument to the contrary, nor do they dispute the clear position of the law that assignees lack privity of contract, even if a valid assignment has occurred.[28] Plaintiff AG Route Seven Partnership is therefore dismissed for all purposes.

---

**28.** *See Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 581, 467 F.2d 1343, 1348 (1972) ("Terminal's assignment to plaintiff of the right to contract proceeds could not, and did not, create any contractual relationship whatsoever

between plaintiff and the United States."); *Twin City Shipyard, Inc. v. United States,* 21 Cl.Ct. 582, 588 (1990) (citations omitted) (assuming *arguendo* that a valid assignment had occurred, "a valid assignment of contract proceeds, standing alone,

## D. Jurisdiction on Other Grounds

### 1. Standing as Derivative Shareholders

■ Shareholders can only bring a derivative claim on behalf of a corporate entity if no other legal representative for the entity does so, or if the legal rights of the corporate entity are not adequately represented. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293–96 (Fed.Cir.1999). Here, the FDIC is present as such legal representative of the corporate entity, to wit, as receiver, and has alleged all claims that it perceives the entity can successfully pursue. Plaintiff shareholders have not alleged any other claims available to New Surety not raised by the FDIC. Therefore, private plaintiffs have no standing as derivative shareholders.[29]

### 2. Standing as Statutory Beneficiaries

■ Plaintiffs' statutory right is that of mere shareholders. Notwithstanding FDIC's presence as receiver for New Surety, private plaintiffs' rights as "statutory beneficiaries" are unabated pursuant to 12 U.S.C. § 1821(d)(11)(A)[30] (delineating the distribution priority of liquidated insured depository institutions). We recognize that the Court in

*First Hartford Corp.*, 194 F.3d at 1288 ruled that shareholder plaintiffs may have statutory standing to pursue "taking" claims as to any surplus in liquidation assets that may result from a ruling in favor of FDIC. However, plaintiffs have not framed their taking claims as such, nor have plaintiffs alleged that their statutory interests are in any way compromised within the statutory scheme. For the foregoing reasons, private plaintiffs lack standing as statutory beneficiaries in the present cause of action.[31]

### E. Cross-claims Against FDIC

■ This court lacks jurisdiction over private plaintiffs' cross-claims against the FDIC. In its capacity as receiver for New Surety, plaintiff FDIC is merely standing in the shoes, and thus asserting the claims, of the defunct thrift. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Consequently, the FDIC's attendant role herein is tantamount to that of a private party, and not the government *per se*.[32] Since Tucker Act jurisdiction conferred upon this court is narrowly tailored to monetary claims against the United States government, *see Murray v. United States*, 817 F.2d 1580, 1582–83 (Fed.Cir.

does not create privity of contract between the assignee and the United States"); *compare La-Van*, 53 Fed.Cl. at 302 (finding that the original acquirers were direct parties to the contract, thus had standing; but two of the plaintiff shareholders who purchased their shares from one of the original acquirers, four years after the conversion, were not direct parties to the contract, and therefore lack standing).

**29.** This is so notwithstanding the fact that the FDIC, later, fails to meet the case-or-controversy requirement to maintain its action as to liability. As discussed in part IV *infra*, the FDIC generally lacks standing in *Winstar*-type cases absent a claim for damages in excess of the amount of liquidation expenses owed by the thrift to the government. That is, in any event, there can be no net recovery by shareholder plaintiffs, either in the presence or absence of the FDIC.

**30.** 12 U.S.C. § 1821(d)(11)(A) (2001) provides as follows:

"Subject to section 1815(e)(2)(C) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than

secured claims to the extent of any such security) in the following order of priority:
(i) Administrative expenses of the receiver.
(ii) Any deposit liability of the institution.
(iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).
(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).
(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company)."

**31.** Plaintiffs also argued standing due to "fair result," but offered little reasoning and no case law in support thereof. We will not speculate as to plaintiffs' intended meaning and, therefore, will not give this argument any more consideration beyond mentioning it here.

**32.** *See Glass*, 44 Fed.Cl. at 80–81 (discussing the duplex role of the FDIC in *Winstar*-type cases resulting from the abolishment of the FSLIC through FIRREA, and the subsequent creation of the FSLIC Resolution Fund ("FRF")-RTC versus FRF–Corporate or manager).

1987), the court lacks jurisdiction to hear claims between private parties. Hence, private plaintiffs' cross-claims against the FDIC must be dismissed.[33]

### F. Fifth Amendment Claims

#### 1. Taking

Private plaintiffs have framed their Fifth Amendment taking claim relative to the enactment of FIRREA and the denial of their alleged contract rights to the use of supervisory goodwill and regulatory forbearance. Given that plaintiffs have been found not to have been parties to any contract with the government herein, their taking claim must be dismissed as moot. Even so, case law is clear that Fifth Amendment taking claims are inapposite with contract claims when the government is a mere party to a contract and not acting as a sovereign, as was the case here. *See Home Savings,* 51 Fed.Cl. at 496 (quoting *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060 (Fed.Cir. 2001)); *see also Castle,* 301 F.3d at 1341–42 (quoting *Castle v. United States,* 48 Fed.Cl. 187, 219 (2000)) (affirming the finding by the trial court that "FIRREA did not effect a taking of [plaintiffs'] contract … because they retained 'the range of remedies associated with the vindication of a contract.'").

#### 2. Due Process

It is uncontested that this court lacks jurisdiction over Fifth Amendment due process claims. The Federal Circuit has "established that there is no jurisdiction under the Tucker Act over a Due Process claim unless it constitutes an illegal exaction," which is not claimed here. *Casa De Cambio Comdiv S.A., De C.V. v. United States,* 291 F.3d 1356, 1363 (Fed.Cir.2002) (citations omitted); *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997) ("The Court of Federal Claims correctly concluded that it does not have jurisdiction to hear Crocker's due process or seizure claims under the Fifth Amendment to the United States Constitution.") (citations omitted).

### G. Summary

We GRANT defendant's motion to dismiss private plaintiffs on the ground that private plaintiffs are not direct parties to the agreement with the government that was allegedly breached by the passage of FIRREA. Private plaintiffs therefore lack privity of contract with the government, hence, this court lacks subject matter jurisdiction. We also GRANT defendant's motion to dismiss private plaintiffs' additional claims as to (i) the inapplicability of the exception to privity of contract as third-party beneficiaries; (ii) AG Route Seven Partnership is dismissed for lack of privity by operation of law; (iii) lack of standing to maintain a shareholder derivative claim; (iv) lack of standing as statutory beneficiaries; (v) the court's lack of jurisdiction over private plaintiffs' cross-claims against the FDIC; (vi) private plaintiffs' taking claim is also foreclosed as a matter of law; and (vii) the court's lack of jurisdiction over private plaintiffs' due process claims.

### IV. PRIVATE PLAINTIFF'S "SHORT FORM" MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AND PLAINTIFF FDIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Based upon the court's finding *supra* that private plaintiffs lack privity of contract with the government, and the subsequent dismissal of private plaintiffs for lack of subject matter jurisdiction, the court hereby DISMISSES the private plaintiffs' motion for partial summary judgment on contract liability, as moot. When defendant filed its opposition to plaintiff's short-form motion on July 9, 1998, it was combined with a motion to dismiss in which defendant challenged plaintiff FDIC's standing based upon a lack of "case or controversy." Plaintiff FDIC later filed a motion for partial summary judgment on contract liability on October 10, 2000.

### A. Jurisdiction

As recited in the previous section, 28 U.S.C. § 1491(a)(1) of the Tucker Act grants

---

**33.** As a practical matter, private plaintiffs' cross-claims, even if permissible, would not secure any better right to recovery than is already available to private plaintiffs statutorily as shareholders pursuant to 12 U.S.C. § 1821(d)(11)(A).

this court the power to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied-in-fact contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

The Tucker Act, however, merely prescribes the jurisdictional scope of this court but does not create a substantive right of recovery against the government. *Testan,* 424 U.S. at 398, 96 S.Ct. 948. A claimant, thus, must concurrently plead a substantive right to monetary relief based upon a specific federal law or statute, or an express or implied-in-fact contract with the government. *Id.* Plaintiff FDIC has so alleged the breach of a contract with, and Fifth Amendment Constitutional violations by, the government.

### B. FDIC's Motion for Partial Summary Judgment on Contract Liability

Summary judgment is proper, pursuant to RCFC 56(c), "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." On summary judgment, the inferences to be drawn from the underlying facts contained in such materials must be viewed in a light most favorable to the party opposing the motion. *Id.*

The trial judge's primary function then is not to weigh the evidence and determine the truth of the matter, but rather it is to determine whether there are genuine issues of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material such that only those operative facts that could affect the outcome of a suit can properly preclude summary judgment. *Id.* at 248, 106 S.Ct. 2505.

The facts herein are largely undisputed, only the legal interpretation thereof are in dispute. Defendant argues that the Acquisition Agreement between New Surety and the FSLIC was not an agreement with the gov-

ernment. Rather, the FSLIC was acting in its capacity as receiver, which makes it an agreement between private parties. However, in *Winstar Corp.,* the Federal Circuit *en banc* found that the FSLIC and the FHLBB were acting in their regulatory capacities respecting these types of agreements, *i.e.,* as agents for the government, *Winstar Corp.,* 64 F.3d at 1548, and was such later affirmed by the Supreme Court, *Winstar,* 518 U.S. 839, 116 S.Ct. 2432. We, therefore, reject defendant's argument.

### 1. Implied–in–Fact Contract

■ The elements of an express or implied-in-fact contract with the government are the same. *Trauma Serv. Group,* 104 F.3d. at 1325. There must be: (1) mutuality of intent to contract, (2) lack of ambiguity of an offer and acceptance, (3) consideration, and (4) actual authority of the government agent to bind the government. *City of El Centro,* 922 F.2d at 820.

The record reveals the existence of various documents having different signers on each, none of which standing alone is a contract, *i.e.,* the lack of a single integrated document. However, when these separate documents are read in tandem, they collectively reflect not only the full intent of the parties, but the actual events that flowed from their agreement. For reasons discussed in part III *supra,* the court found not an express but an implied-in-fact contract between New Surety and the government containing multiple transactions.

### i. Mutuality of Intent to Contract

"In determining whether mutuality of intent has been established, it is important to remember that 'for a contract to exist there does not have to be, and rarely is, a *subjective* meeting of the minds all along the line.' *Penn–Ohio Steel Corp. v. United States,* 173 Ct.Cl. 1064, 1084 n. 19, 354 F.2d 254, 266 n. 19 (1965), *quoting WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 11, 323 F.2d 874, 879 (1963) (emphasis added). Rather, the inquiry is an objective one. Acceptance of the offer must be manifested by conduct which, viewed objectively, indicates assent to

the proposed bargain. *See Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976)." *City of El Centro*, 16 Cl.Ct. at 506. Although an express offer and acceptance are not necessary, the parties' conduct must indicate mutual assent. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998) (citation omitted).

### ii. Lack of Ambiguity in Offer and Acceptance

Here, there was no express offer and acceptance between New Surety and the government, but mutual assent is evident. Generally, a bid proposal can be construed as an offer. In this instance, however, NCG, a prospective shareholder, who was not an incorporator of New Surety, proposed certain conduct on the part of New Surety upon its formation. At best, NCG mapped out a course of conduct that, if followed, would yield a certain result. But NCG could only speculate as to what New Surety would actually do, and it certainly could not bind the prospective conduct of New Surety.

Only upon New Surety's formation did it begin to take the necessary steps *on its own behalf* to show its intent to contract with the government. Those steps included the execution of the Plan of Organization and Acquisition Agreement, and the authorization and issuance of shares of stock, among other things.

### iii. Consideration

Consideration between the government and New Surety is plain and intelligible. New Surety assumed the liabilities of Old Surety in excess of the value of the assets, which was the price paid, or the detriment incurred, by New Surety. In exchange, the government provided to New Surety the favorable accounting treatment of supervisory goodwill and regulatory forbearance.

### iv. Authority to Bind the Government

The actual authority of the government agents to bind the government can be found in the regulatory statutes then in effect, to wit, 12 U.S.C. § 1725(c)(3)(repealed) (authority to make contracts), 12 U.S.C. § 1729(f)(2)(A)(repealed) (authority to assist acquirers of insolvent thrifts), and 12 U.S.C. § 1730(t)(2)(repealed) (authority to set minimum capital limits). *See Winstar Corp.*, 64 F.3d at 1548.

Thus, the indispensable elements of a contract with the government have been satisfied, though the facts support not an express contract, but the formation an implied-in-fact contract.

### 2. Breach of Contract

*Winstar* and its progeny support a finding of contract breach by the government *vis a vis* the enactment of FIRREA. "After FIRREA and its implementing regulations, the bank regulatory agencies limited [supervisory goodwill] as acceptable regulatory capital and limited the amortization periods. As a result, Winstar and Statesman were immediately thrown into noncompliance with the new regulatory capital requirements and were seized by federal regulators within approximately six months .... We conclude the government failed to perform its contractual obligations under plaintiffs' contracts." *Winstar Corp.*, 64 F.3d at 1545.

The facts in the case here at bar are no different than those present in *Winstar Corp. supra*. We found previously that an implied-in-fact contract existed between New Surety and the government whereby the government agreed to allow New Surety to amortize $12.2 million in supervisory goodwill over a 25–year period, and forbearance from regulatory capital requirements for three years. However, as a direct result of FIRREA, New Surety was no longer permitted to amortize the supervisory goodwill asset remaining on its books. And, it was no longer privileged to forbearance from attaining regulatory capital requirements. New Surety, thus, as did the banks in *Winstar Corp.*, immediately fell out of regulatory compliance and was subsequently seized by federal regulators.

"There is nothing extraordinary about the contracts in these cases save for their subject matter and the potential liability to the government. It is well established that the government may enter into contracts with private individuals as parties. [citation omitted] .... [W]hen the government enters into

such contracts, 'its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Winstar Corp.*, 64 F.3d at 1551 (citations omitted). "Failure to perform a contractual duty when it is due is a breach of the contract." *Winstar Corp.*, 64 F.3d at 1545 (citation omitted).

### C. Liability vs. FDIC's Standing

■■■ Defendant has challenged plaintiff FDIC's standing to pursue its claims on behalf of New Surety on the ground of non-justiciability. That is to say, the FDIC's presence in this matter represents an intergovernmental dispute, and not a true "case or controversy" pursuant to Article III, section 2 of the United States Constitution (limiting judicial power to the resolution of actual cases or controversies). *See Glass*, 258 F.3d at 1355.

Recent case law authority has found that the case-or-controversy requirement has been met when the amount of damages the FDIC is seeking in these *Winstar*-type cases exceeds the total liquidation costs to the government.[34] Under the statute governing the distribution of liquidated assets, to wit, 12 U.S.C. § 1821(d)(11)(A), the FDIC has superior distribution priority to the thrift's surplus assets. *Glass*, 258 F.3d at 1355–56. In other words, should the FDIC prevail as the receiver on behalf of the thrift, the FDIC as creditor/deposit insurer would be the first to be made whole.

Thus, if the surplus assets from a damages award will not be sufficient to provide recovery to any other creditors after the government is reimbursed for its liquidation costs and expenses, shareholders having least pri-

ority, then there is no case or controversy present in the claim. In the foregoing circumstance, the Federal Circuit has consistently denied FDIC standing.[35]

In the case here at bar, plaintiff FDIC claims damages under two possible, yet alternative, recovery theories:[36] (1) Restitution, in the amount of $5.31 million, and (2) Fair Market Value of $5.36 million. When the highest proposed recovery amount of $5.36 million is compared to $5,717,685 (including interest)[37] in government claims against any such recovery, it leaves nothing available for creditors other than the government. To wit:

> Based upon the FDIC's June 18, 2003 damages brief, and its subsequent response to the court's Show Cause Order, we have determined that the distribution of any recovery would lawfully flow to the government as follows:

| | |
|---|---|
| Litigation expenses: | $1,431,000 |
| FDIC–RTC subrogated claims: | $1,830,367 |
| Accrued interest on FDIC–RTC subrogated claims: | $2,456,318 |
| | $5,717,685. |

It has been established in case law that the government's statutory claim priority cannot be subordinated at the discretion of the FDIC.[38] The FDIC failed in its proof, *vis a vis* this court's June 25, 2003 Order to Show Cause why it should not be dismissed, to demonstrate to the court that some other lawful manner of distribution would occur. Specifically, whether the accrued interest on the FDIC–RTC's subrogated claim shares the same priority as the subrogated claim itself.

---

**34.** *See Landmark Land Co.*, 256 F.3d 1365.

**35.** *See Admiral Financial Corp. v. United States*, 329 F.3d 1372 (Fed.Cir.2003); *Landmark Land Co.*, 256 F.3d 1365; *Glass*, 258 F.3d 1349.

**36.** Although the merits of any damages claims are beyond the scope of this opinion, the court considered the parties' June 2003 damages briefs (and other responses) for the sole purpose of applying current case law to the issue of FDIC standing, as raised herein.

**37.** *See American Heritage Bancorp v. United States*, 53 Fed.Cl. 723, 724 (2002) (noting the inclusion of interest when determining whether

the FDIC has met the case or controversy requirement).

**38.** *See Glass*, 258 F.3d at 1355–56 ("The FDIC contends that any damages award will be distributed to the creditors of Security Savings, and this, the FDIC argues, renders its claim justiciable. We disagree. While any net recovery by the FDIC would be distributed to creditors under the statutory scheme applicable to the Security receivership, in this case FRF–RTC has priority over all other creditors under this statutory scheme.").

Absent any binding law to the contrary,[39] we have answered that question in the affirmative. In *Landmark,* the Federal Circuit steadfastly held that "under the statutory scheme of priority for thrift creditors, *the FDIC is obligated to completely satisfy the claim of the government,* specifically that of the FSLIC Resolution Fund." 256 F.3d at 1381 (emphasis added). Therefore, plaintiff FDIC lacks standing to proceed in the present action on liability. Defendant's July 9, 1998 motion to dismiss FDIC for lack of standing is GRANTED. FDIC's October 10, 2000 motion for partial summary judgment is DISMISSED.

## V. DEFENDANT'S MOTION TO DISMISS ALL NON-CONTRACT CLAIMS OF PRIVATE PLAINTIFFS AND OF FDIC; MOTION (AND CROSS-MOTION) FOR SUMMARY JUDGMENT ON ALL CONTRACT CLAIMS OF PRIVATE PLAINTIFFS AND OF FDIC; AND SUPPLEMENT TO OPPOSITION TO PLAINTIFFS' SHORT FORM MOTION FOR SUMMARY JUDGMENT [40]

Defendant's October 10, 2000 motion to dismiss all non-contract claims of private plaintiffs was supplanted by its February 7, 2003 motion to dismiss private plaintiffs, which has already been decided in defendant's favor, *supra.* Moreover, defendant's motion (and cross-motion) for summary judgment on all contract claims is hereby DISMISSED as redundant or moot. The only issue remaining before us is defendant's motion to dismiss all non-contract claims of plaintiff FDIC.

All of the non-contract claims raised by plaintiff FDIC are the same as those we previously dismissed in relation to the private plaintiffs, *supra,* to wit, under the Fifth Amendment taking [41] and due process clauses. And, for the same reasons set forth in section III, we hereby GRANT defendant's motion to dismiss the non-contract claims raised by plaintiff FDIC. Private plaintiffs' December 18, 2000 cross-motion for summary judgment, and plaintiff FDIC's January 21, 2001 cross-motion for summary judgment are DISMISSED, as moot.

## VI. CONCLUSION

With respect to all of the pending motions, the court rules as follows:

(i) *Dismisses* private plaintiffs' April 3, 1998 short-form motion for partial summary judgment as to liability, as moot;

(ii) *Grants,* in part, defendant's July 9, 1998 motion to dismiss, as to FDIC's lack of standing, and *Dismisses,* in part, as to private plaintiffs' claims, as moot;

(iii) *Dismisses* plaintiff FDIC's October 10, 2000 motion for partial summary judgment on liability;

(iv) *Grants,* in part, defendant's October 10, 2000 motion to dismiss the non-contract claims of plaintiff FDIC, *Dismisses,* in part, as moot, the non-contract claims of private plaintiffs, and *Dismisses,* as to the FDIC and private plaintiffs, as moot, defendant's motion (and cross-motion) for summary judgment as to contract liability;

(v) *Dismisses,* as moot, both the private plaintiffs' December 18, 2000 and plaintiff FDIC's January 12, 2001 respective cross-motions for summary judgment; and

(vi) *Grants* defendant's February, 7, 2003 motion to dismiss private plaintiffs, as to all contract and non-contract claims.

Given all of the foregoing, the amended complaints of private plaintiffs filed in April 1997 and plaintiff FDIC filed in March 1997

---

**39.** Plaintiff FDIC has only referenced regulations by comparison, to wit, 12 CFR § 360.3 and 12 CFR § 360.7, which admittedly are not applicable here, as authority for its proposition that accrued interest on the government's claim does not have priority over the principal claims of other creditors. The FDIC also cited to case law which is neither binding on this court, nor the actions of the FDIC, on the matter of how any proceeds may lawfully be distributed.

**40.** Defendant filed these motions (in a single brief) on October 10, 2000.

**41.** To the existent that the takings claim advanced by the FDIC is tied to its contract claim.

shall be dismissed. The Clerk shall enter judgment accordingly. No costs.

**IT IS SO ORDERED.**