**O. Bruton SMITH and Helen W. Smith, Executrix for Plaintiff Bill Smith, deceased, Plaintiffs,**

**and**

**The Federal Deposit Insurance Corporation, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 92–540C.

United States Court of Federal Claims.

Oct. 22, 2003.

Gaston Gage, Parker, Poe, Adams & Bernstein, Charlotte, North Carolina, argued for the plaintiff.

John F. Elmore, Receivership Goodwill Section, FDIC Legal Division, Federal De-

posit Insurance Corporation, argued for the plaintiff-intervenor.

Gregory R. Firehock, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for the defendant.

## OPINION AND ORDER

BLOCK, Judge.

This is a *Winstar*-related case. The issue addressed in this decision is that of standing to sue. Far more than a "mere technicality," the doctrine of standing goes to the heart of the constitutional separation of powers because it defines the contours of the judicial power. It "serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990). It is through such mechanisms as standing that federal judicial power is limited, at times helping federal courts over the years live up to their appellation as the "least dangerous" of the branches of government.[1]

Plaintiffs O. Bruton Smith and Bill Smith (now deceased, but represented by his executrix, Helen W. Smith) were shareholders of North Carolina Federal Savings and Loan Association ("NCF"), a thrift that allegedly failed because it could not fulfill federal regulatory capital requirements in the wake of enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 State. 183 ("FIRREA"). The Smiths filed suit against the United States, asserting a *Winstar* breach of contract claim by contending that NCF failed as a result of FIRREA's prohibition against counting supervisory goodwill toward its regulatory capital requirement.

Particularly, the Smiths contend, *inter alia,* that they and the other NCF shareholders relied to their detriment on the promise made by the federal banking regulators to allow the use of supervisory goodwill to offset regulatory capital requirements and to amortize this new and strange specie of goodwill over an extended period. Accordingly, the Smiths maintain that they and other shareholders were duped into approving the 1982 merger of NCF with another thrift. The Smiths contend the government's adoption of FIRREA was both the actual and proximate cause of the loss in value of their shares and assert both a personal and a derivative claim.

The Federal Deposit Insurance Corporation ("FDIC") intervened in this action as a plaintiff, and represents the interests of now-defunct NCF pursuant to its status as receiver. The FDIC contends that the government's adoption of FIRREA breached its agreements with NCF regarding supervisory goodwill. The FDIC asks that the court declare the provisions of FIRREA and subsequent actions of federal regulators constitute a "repudiation, breach, and abrogation" of the FDIC's contract rights, and a compensable taking under the Fifth Amendment to the United States Constitution. Compl. in Intervention of Pl. FDIC at 10.

The Smiths commenced this action on July 7, 1992. The FDIC received permission to intervene on March 27, 1997. The case, subject to the general *Winstar* Omnibus Case Management Order promulgated by then Chief Judge Smith on September 18, 1996,[2] was subsequently transferred to two judges of this court. During this time, the parties filed a multitude of discovery documents and records, a tangle of discovery motions, defendant's motion to dismiss for lack of jurisdiction (in which the government avers that

---

1. *See* Alexander Bickel, THE LEAST DANGEROUS BRANCH (1986)(arguing that such judicial devices as standing should be employed to avoid controversial political issues). The characterization of the judiciary as the "least dangerous branch" was derived from the *Federalist Papers. See also* THE FEDERALIST No. 78 (Cooke ed. 1961) at 522-23. ("[I]n a government in which [the branches] are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution .... It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.")(Alexander Hamilton writing as *Publius*).

2. *See* Omnibus Case Management Order, Nos. 90–8 C, et al., *Plaintiffs in all Winstar-related Cases at the Court v. United States,* September 18, 1996.

both plaintiff Smiths and intervenor FDIC lack standing), and cross motions for summary judgment.

After another transfer to the present judge, the court, slicing through the Gordian Knot of pending motions and cross motions, issued an Order to Show Cause ("OSC") on July 17, 2003. In the intervening years since the complaint was filed and the FDIC intervened, both the Federal Circuit and the Court of Federal Claims addressed the issue of whether a shareholder who claims to be harmed by the loss of supervisory goodwill engendered by the enactment of FIRREA has standing to sue in a *Winstar*-type case. Likewise, these courts confronted the standing issue arising from the anomaly whereby a creature of the United States—here the FDIC—sues the United States and seeks damages to be paid to the United States. By-and-large, the courts concluded that in neither circumstance is standing to sue present.

Consequently, in the order this court asked the Smith plaintiffs and plaintiff-intervenor FDIC to articulate why this court should not dismiss their claims for lack of standing in light of the relevant court decisions including, but not limited to, *Hansen Bancorp v. United States,* 66 Fed.Appx. 849, 2003 WL 21267457 (Fed. Cir. Jun 2, 2003), *Admiral Financial Corp. v. United States,* 329 F.3d 1372 (Fed.Cir.2003), *Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002), *Glass v. United States,* 258 F.3d 1349 (Fed.Cir.2001), *Landmark Land Co. v. United States,* 256 F.3d 1365 (Fed.Cir.2001), and *La Van v. United States,* 56 Fed.Cl. 580 (2003).

After review of supplemental briefing addressing the OSC, and for the reasons fully stated below, this court concludes that O. Bruton Smith, Helen W. Smith, and the FDIC each lack standing to assert claims against the United States. As a result, with a lack of standing by the parties, judgment should be entered in favor of the defendant.

## I. Background

The facts below, unless otherwise noted, are undisputed and are in part derived from the Smiths' second amended complaint, the

defendant's motions to dismiss the Smiths for lack of standing, and the parties' responses to this court's July 17, 2003 OSC. They are offered to present useful background and to highlight the issue of the standing of the Smiths and the FDIC to prosecute this action.

As stated, this is a *Winstar*-related case. As a consequence of the Great Depression, the Home Loan Bank Board Act of 1932[3] was enacted to spur savings and loan associations, also known as thrift institutions, to promote personal savings and to assist consumers in purchasing their own homes, thereby improving the material comfort of average Americans and stimulating the economic vitality of the nation. Thrift institutions primarily accomplished this task by providing low interest rate loans to acquire home mortgages.

The thrifts were fairly successful and profited accordingly until the so-called savings and loan crisis of the late 1970's and early 1980's. The crisis was precipitated by high interest rates, coupled at times with managerial misfeasance or even malfeasance, which jeopardized the financial well-being and even the existence of the many thrift institutions. Saddled with traditional, low-interest-bearing home mortgage loans and fettered by the inability by law to diversify, thrifts had to pay high interest rates to compete for short-term deposits. *U.S. v. Winstar Corp.,* 518 U.S. 839, 845, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The result was that the cost of liabilities quickly exceeded the thrifts' income from their long-term, low-rate home mortgages. *Id.* As a result, more than 400 thrifts declared bankruptcy between 1981 and 1983, threatening to exhaust the insurance fund of the Federal Savings and Loan Corporation ("FSLIC"), which insured the thrifts' depositors. *Id.* at 846–47, 116 S.Ct. 2432.

In response to that crisis, the Federal Home Loan Bank Board ("Bank Board"), the federal regulatory agency responsible for regulating federally-chartered savings and loans, encouraged healthy thrifts and outside investors to purchase insolvent thrifts in a series of "supervisory mergers." *Id.* at 847,

---

**3.** 12 U.S.C. § 1442 *et seq.*

116 S.Ct. 2432. To induce those mergers, the Bank Board offered certain financial incentives, the most important being the accounting treatment of "supervisory goodwill," a term for the difference between the market value of the acquired entity's liabilities and assets. *Id.* at 848–50, 116 S.Ct. 2432. As part of this inducement, the Bank Board permitted the acquiring thrifts to count supervisory goodwill toward their reserve capital requirements, often to be amortized over a long period of time, thus allowing thrifts to appear more profitable than they were in reality. *Id.* at 850–53, 116 S.Ct. 2432.

Not satisfied with the progress to date, Congress stepped in and passed FIRREA. Enacted in 1989, FIRREA in essence fired the thrift regulators by abolishing the Bank Board and FSLIC, establishing the Office of Thrift Supervision ("OTS") as the new thrift regulatory agency, and transferred the responsibility to insure thrift deposits to the Federal Deposit Insurance Corporation ("FDIC"). FIRREA also created the Resolution Trust Corporation ("RTC") to close and liquidate the assets of certain failed thrifts. Significantly, FIRREA further mandated that thrifts maintain a set minimum capital requirement and prohibit the use of supervisory goodwill. *Id.* at 857, 116 S.Ct. 2432.

Scores of lawsuits were filed challenging FIRREA under various theories including breach of the contracts promising particular regulatory treatment. *Id.* at 858–59, 116 S.Ct. 2432. Thereafter, the United States Supreme Court in *Winstar* held that enactment of FIRREA breached the various existing agreements between certain Savings and Loan Thrift Institutions and their federal regulators providing for the supervisory mergers. *Id.* at 859–60, 116 S.Ct. 2432. This decision further opened the flood-gates of litigation that collectively sought hundreds of millions of dollars in damages. All of this proves the sagacity, indeed, the prescience, of Abraham Lincoln, who observed that "[l]egislation and adjudication must follow, and conform to, the progress of society." [4]

**4.** Abraham Lincoln (1809–1865). President of the United States, 1861–65. Notes of argument in law case, June 15, 1858, reprinted in 2 COL-

Proving Lincoln once again a prophet, the so-called *Winstar* cases similarly led to significant developments in the ancient law of contracts, as well as a refinement of certain aspects of the law of federal jurisdiction, such as the doctrine of standing. Indeed, the present case is an example of the latter.

In 1982, Carolina Federal Savings and Loan Association ("CFS"), a Raleigh, North Carolina thrift, nearly collapsed from the savings and loan crisis of the early 1980's. CFS sought help from the federal government hoping to stave off its demise and liquidation. In response, the Federal Savings and Loan Association Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") actively pursued solvent thrifts that could merge with CFS and restore its profitability. Both the FSLIC and the FHLBB preferred a merger to liquidation because the FSLIC could be obligated to pay CFS' creditors and depositors millions of dollars from the FSLIC's insurance fund.

In its quest for viability, CFS turned to North Carolina Federal Savings and Loan Association ("Old NCF") of Charlotte, North Carolina. Old NCF, however, approached the merger negotiations with a certain degree of trepidation. Its board and major shareholders were concerned that a merger could materially undermine Old NCF's financial viability. As a result, Old NCF began the merger negotiations with the primary goal of finding a way to preserve its solvency and shareholder value.

## A. The 1982 CFS–Old NCF Merger

As a part of the merger negotiations, Old NCF sought assurances from the FHLBB and FSLIC in the form of favorable accounting treatment. In particular, Old NCF wanted the ability to count so-called supervisory goodwill, the difference between CFS' purchase price and its fair market value, towards its regulatory capital requirements. Old NCF viewed the accounting treatment of supervisory goodwill as a critical factor in the

LECTED WORKS OF ABRAHAM LINCOLN 459 (Rutgers University Press (1953, 1990)).

merger's overall success. After approving the accounting treatment for the merger, the FHLBB proceeded with the transaction and allowed Old NCF to record supervisory goodwill as a capital asset on the books of the surviving corporation. The FHLBB, as was usual in *Winstar* cases, also allowed the emerging entity to amortize such goodwill over 40 years.

As a part of the merger, Old NCF purchased all of CFS' outstanding common stock at a cost of $905,000. Old NCF then merged into CFS, but CFS remained the surviving corporation. Old NCF shareholders then engaged in a one-for-one exchange for shares of CFS. CFS adopted Old NCF's charter and bylaws, and changed its name to North Carolina Federal Savings and Loan Association ("New NCF"). The shareholders then met and voted in favor of the merger, thereby ratifying New NCF as the emerging entity.

### B. *"Infusion of Capital" and Reorganization*

In 1985, the FHLBB adopted new regulations raising the capital requirements of FSLIC-insured institutions. As a result, New NCF suffered a corresponding net worth shortfall and fell into danger of liquidation. About 72 stockholders, including O. Bruton Smith and Bill Smith, purchased $3 million of New NCF preferred stock. Pls.' Sec. Am. Compl. at ¶ 40. This transaction, coupled with the accounting treatment of supervisory goodwill, allowed New NCF to remain solvent and meet its regulatory capital requirements. O. Bruton Smith and Bill Smith contributed $2.5 million and $120,000 respectively. *Id.*

In 1988, New NCF reorganized whereby NCF Financial Corporation ("NCF") acquired all of New NCF's outstanding stock and issued NCF stock on a one for one basis to New NCF's shareholders. This reorganization converted the Smiths' investment from shares in New NCF to shares in NCF. The NCF formation relied on the same accounting treatment of supervisory goodwill that

accompanied the original 1982 merger of CFS and Old NCF. *Id.* at ¶ 42.

In 1989, after Congress enacted FIRREA, NCF could no longer satisfy its statutory requirements and the OTS seized control of NCF on March 1, 1990. Compl. in Intervention of Pl. FDIC at ¶ 9. The RTC thereafter became NCF's receiver, and the FDIC succeeded to RTC's responsibilities upon the RTC's statutory expiration pursuant to 12 U.S.C. § 1441a(m)(1).[5] In March 1990, the government placed NCF into receivership pursuant to 12 U.S.C. § 1821(c)(6). NCF's stock, of course, subsequently suffered a precipitous loss in value. The FDIC as receiver thereafter sought NCF's dissolution in an effort to satisfy NCF's creditors.

### C. *The Current Action*

On August 7, 1992, the Smith plaintiffs filed suit against the United States (and later amended their complaint on April 14, 1997) alleging the government breached its contract with NCF and the Smiths by enacting FIRREA and implementing its subsequent regulations. Specifically, the Smiths make two breach of contract claims and three derivative claims. In the first contract claim, the Smith plaintiffs argue the government dangled the prospect of supervisory goodwill in front of the Smiths and the other Old NCF shareholders to induce their approval of the 1982 CFS–NCF merger. The Smiths allege they relied on this promise to their detriment when they voted in favor of the Old NCF–CFS merger. The Smith plaintiffs seek damages totaling $28 million as the value of the benefits Old NCF conferred on the United States in the Old NCF–CFS merger. Pls.' Sec. Am. Compl. at ¶ 63.

Next, in the second contract claim, the Smith plaintiffs maintain that the government altered its regulations[6] in 1985 for the specific purpose defraying government costs for the potential liquidation of New NCF by inducing its shareholders to contribute $3 million to meet the increased regulatory capi-

---

5. "The Corporation shall terminate not later than December 31, 1995. If at the time of its termination, the Corporation is acting as a conservator or receiver, the Federal Deposit Insurance

Corporation shall succeed the Corporation as conservator or receiver."

6. Pls.' Sec. Am. Compl. at ¶¶ 39, 71.

tal requirements. *Id.* at ¶¶ 39–41. The Smiths claim they, as well as 72 other shareholders, relied on the government's promise to credit supervisory goodwill against capital requirements when the shareholders contributed the $3 million to New NCF. After this investment, however, the Smiths allege the United States' adoption of FIRREA "fundamentally changed the nature of the investment of [the Smiths] and the other stockholders, rendering their stock worthless through circumstances beyond their control." *Id.* at ¶ 57. The Smith plaintiffs seek the $3 million as the value of the benefits conferred on the United States in the 1985 capital infusion. *Id.* at ¶ 71.

The Smith plaintiffs' first derivative claim addresses the 1985 $3 million capital infusion to New NCF. Plaintiffs O. Bruton Smith and Bill Smith originally owned Old NCF shares which converted to New NCF shares after the 1982 merger with CFS. In 1985, they purchased an additional $2.62 million of New NCF stock as a part of an overall $3 million capital infusion. *Id.* at ¶ 40.[7] The Smiths assert a derivative claim as shareholders of NCF because NCF's 1988 reorganization transformed all outstanding New NCF shares to NCF shares. As shareholders of NCF, therefore, the Smiths allege the defendant harmed NCF by enacting FIRREA and preventing NCF from using supervisory goodwill as a capital asset, thereby requiring the capital infusion to meet regulatory capital requirements. The Smiths seek $3 million in restitution for the amounts the shareholders contributed to New NCF.

The Smith plaintiffs' second derivative claim arises from the original 1982 Old NCF–CFS merger. As shareholders of NCF, the Smiths believe they are "entitled to have and recover the lost value of the common stock of N.C. Federal held by NCF, for NCF, and for themselves and the other NCF shareholders similarly situated . . . ." Pls.' Sec. Am. Compl. at ¶ 97. The Smiths seek $28 million to recover the value of the equity Old NCF shareholders contributed to the 1982 merger.

The Smith plaintiffs' final derivative claim also springs from the original 1982 merger

between Old NCF and CFS. The Smiths allege the defendant's breach caused NCF to lose the original Old NCF shareholder equity that was part of the 1982 Old NCF–CFS merger. They seek $28 million, which includes the benefits Old NCF conferred on the United States in the 1982 merger, as well as the $3 million capital infusion in 1985.

The Smith plaintiffs also advance a Fifth Amendment takings claim as an alternative to their breach of contract claim. The Smiths' takings claim bears two prongs: first, the government's breach constituted a taking of the value of the Smith plaintiffs' shares, as well as their vested contract rights upon FIRREA's passage. Second, the governments' breach constituted a taking because the Smiths possessed a valid property right in the contract between Old NCF and CFS by virtue of promissory estoppel. The Smith plaintiffs allege the government knew its promises relative to supervisory goodwill would induce reasonable reliance on behalf of the Smiths and the other shareholders at Old NCF. The Smiths seek $28 million in damages as the value of the contract rights taken by the United States.

The FDIC intervened as a plaintiff in its role as the successor-in-interest to NCF's rights and obligations. The FDIC, on behalf of NCF, offers essentially the same breach of contract arguments as the Smiths. Specifically, the FDIC contends FIRREA's restriction on NCF's inclusion of supervisory goodwill as a capital asset "constitute a repudiation and abrogation of [NCF's] contract rights . . . and effect a taking of its property without just compensation, in violation of the Fifth Amendment to the Constitution." Compl. in Intervention of FDIC at ¶¶ 28, 30, and 32. The FDIC asks the court to compensate the FDIC for the value of its costs expended, as well as the benefits conferred on the defendant, through its management and operation of NCF as NCF's receiver. *Id.* at 10, ¶ (b).

## II. Discussion

The sole issue before this court is one of jurisdiction: the respective standing of plain-

---

7. O. Bruton Smith purchased $2.5 million of additional New NCF stock, and Bill Smith purchased an additional $120,000 of New NCF stock. Pls.' Sec. Am. Compl. at ¶ 40.

tiff shareholders and the FDIC in this *Winstar*-type action. At its heart, the doctrine of standing is a jurisdictional requirement stemming from the case-or-controversy requirement of Article III, Section 1 of the Constitution. *E.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)("Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III").[8] It is beyond dispute that this requirement applies to an Article I court, such as the Court of Federal Claims, when the court is exercising the judicial power of the United States. *See Anderson v. United States,* 344 F.3d 1343 (Fed.Cir.2003);[9] *H.C. Bailey, Jr. v. The United States,* 341 F.3d 1342 (Fed.Cir.2003). *See also Freytag. v. Commissioner of Internal Revenue,* 501 U.S. 868, 888–891, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)(Article I tax court construed to be "Court of Law" under Constitution).

## A. *The Smiths' Standing*

The Smiths argue that as investors in Old NCF, which is now the defunct NCF, they (1) possess a direct claim against the United States for breach of contract; (2) suffered derivative harm as shareholders of NCF; and (3) claim the defendant's breach resulted in a compensatory taking under the Fifth Amendment to the United States Constitution. Pl. Resp. to OSC, pp. 1–4. The court addresses each of these arguments *seriatim.*

### 1. *Direct Breach of Contract Claim*

■ The Smith plaintiffs' primary contention is that as shareholders of Old NCF, they were swayed by the government's promise of counting supervisory goodwill as a capital asset and as a result voted for the 1982 Old NCF–CFS merger. Specifically, they argue the FHLBB intended to contract with Old NCF because the FHLBB viewed Old NCF as a viable institution that could "stave of the eminent [sic] failure of Carolina Federal ...." Pls.' Opp. To Def's. Motion for Lv. to File Notice of Supp. Auth. In Supp. Of Consol. Brf. on Standing at 6. The FHLBB, the Smiths allege, knew that such a merger would never occur unless it was financially beneficial to Old NCF and its stockholders. While the FHLBB, the Smiths contend, could compel CFS to merge because of its precarious financial position, it could not require the same of Old NCF or its stockholders.

Old NCF's stockholders, the Smith plaintiffs maintain, held "the ultimate power" to approve the merger with CFS. *Id.* at 3. As stockholders, the Smiths thus claim they conditioned their approval of the merger on a "certain amount" of supervisory goodwill amortized over 40 years. *Id.* at 4. The Smiths claim they relied on this provision in Old NCF's negotiations with the FHLBB, and never would have approved the merger absent a negotiated provision for supervisory goodwill. *Id.* The Smiths contend the shares acquired after the merger would be worthless without the supervisory goodwill. "Absent contract, the goodwill would not be a depreciable capital asset but merely a shadowy, unstable figment of the imagination, an unsubstantial nothing, which would leave [the Smiths'] merged corporation insolvent and

---

8. The *Lujan* Court defined standing as having three components:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be [fairly traceable to the challenged action of the defendant]. Third, it must be likely, as opposed to merely speculative, that the injury will be [redressed by a favorable decision].

*Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130 (citations and internal quotations omitted).

9. "The Court of Federal Claims, though an Article I court, 28 U.S.C. § 171 (2000), applies the same standing requirements enforced by the other federal courts created under Article III," *Anderson,* 344 F.3d 1343, 1354–55, n. 1 (citing *Glass v. United States,* 258 F.3d 1349, 1355–56 (Fed.Cir.2001); *CW Gov't Travel, Inc. v. United States,* 46 Fed.Cl. 554, 557–58 (2000), and 28 U.S.C. § 2519 (2000) (empowering the Court of Federal Claims to enter final judgments in any "claim, suit, or demand against the United States arising out of the matters involved in the case or controversy.")).

failing .... Only an utter fool would have ruined his thrift by merging without the contract." *Id.*

Defendant in response contends the Smith plaintiffs lack privity of contract with the government because the Smiths played no role in the merger negotiations between Old NCF and CFS. Defendant stresses the Smiths admitted they had no involvement "directly or indirectly, in any aspect of the negotiations or N.C. Federal's decision to enter into the definitive agreements." Def's. Consol. Brf. in Supp. of Mot. to Dis. Pl. for Lack of Standing at 4.

The Smiths' only connection to the NCF–CFS negotiations, the defendant further alleges, arises through the legal requirement of obtaining shareholder approval for mergers.[10] Furthermore, this mandatory legal requirement, according to defendant, belies the Smiths' contention that there was a voluntary contractual relationship between the Smiths as shareholders and the government because the merger never would have occurred but for the shareholders' approval.

Critical to the issue of privity of contract, defendant points to the Smiths' lack of participation in the regulatory approval of the Old NCF–CFS merger. Indeed, the Smiths are neither mentioned in the relevant documents Old NCF submitted to the FHLBB as a part of the merger, nor are they signatories to these documents. *Id.* at 5. In fact, the only mention of the Smiths, according to defendant, results from the proxy statement Old NCF issued to them prior to the merger. *Id.* at 7. "Nothing in the proxy statement remotely suggests that regulators intended to enter into a contract with either shareholders or the thrift—much less these particular shareholders." *Id.*

The court essentially agrees with defendant.[11] It must be stressed that the Smiths, as the parties invoking jurisdiction, bear the burden of establishing standing. *See Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). *See also Ster-*

*ling Sav. v. U.S.,* 57 Fed.Cl. 234, 236 (2003). The focus of a standing inquiry rests on the status of a party bringing a complaint rather than the merits of his claim. *Id.* "To have standing in this court on a contract claim, plaintiff must be in privity of contract with the government." *Franklin Fed. Sat. Bank v. U.S.,* 53 Fed.Cl. 690, 716–17 (2002)(quoting *Pacetti v. United States,* 50 Fed.Cl. 239, 243 (2001)).

Consequently, the Smiths' claim for standing to sue on their direct breach of contact action ultimately rests on their involvement in, as well as their relation to the parties involved in the Old NCF–CFS merger. In other words, the Smiths must demonstrate how they, as individual shareholders of Old NCF, stood in privity of contract with the United States.

Privity is the "connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property) ..." BLACK'S LAW DICTIONARY 1272 (Bryan A. Garner ed., West Group 7th ed.1999) (1933). To establish privity of contract with the government, the Smith plaintiffs must therefore demonstrate that "they are owed duties by the Government separate and apart from the duties owed to the corporation." *Franklin Fed.,* 53 Fed.Cl. at 717. Ergo, the Smith plaintiffs will only be able to establish standing and maintain their claim against the government if they demonstrate the government breached an express or implied duty owed to the Smiths personally and independently of their status as shareholders of NCF.

The Smith plaintiffs clearly lack privity with the government. There is simply no contractual relationship between the Smiths and the government deriving from the regulatory forbearance agreement to provide for the use of supervisory goodwill. Nor is there any demonstrable agreement between the Smiths and the government. The fact that the regulators knew a vote from shareholders was necessary to approve a merger or

---

10. 12 C.F.R. § 552.13(h) (2003); N.C. GEN. STAT. § 54B–35(3)–(4) (2003) (merging savings and loan associations must obtain stockholder approval to merge).

11. The court notes that the FDIC takes no position as to the Smith plaintiffs' direct contract claims.

that shareholders expected favorable regulatory treatment for the surviving thrift does not make the Smiths parties to the contract. *See FDIC v. United States,* 342 F.3d 1313, 1319 (Fed.Cir.2003)(knowledge that shareholders will supply new capital to rehabilitate thrift does not make shareholders party to contract). The uncontested facts in the record do not indicate the government regulators either intended to negotiate directly with the Smiths, or actually did negotiate directly with the Smiths.[12]

The government, furthermore, did not execute any direct agreement with the Smiths. No implied-in-fact agreement existed because there simply is no evidence of a mutual intent to contract. Nor have the Smiths demonstrated any kind of "meeting of the minds" with the government. *See Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997) (requirements for both an express or implied contract under Tucker Act are the same: (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) actual authority of the government representative whose conduct is relied upon to bind the government in contract). *See also Lewis v. United States,* 70 F.3d 597, 600 (Fed.Cir.

1995); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990).

Simply put, the FHLBB merely facilitated the merger between Old NCF and CFS. Any benefits or detriments flowing to the Smiths occurred not because they were parties to that merger or parties to a regulatory agreement, but simply because they were shareholders of the corporate entity involved and suffered losses or derived benefits no different than any other shareholder. Indeed, this breach of contract claim may only be brought by the FDIC in its capacity of successor-in-interest to NCF because the Smiths in their capacity as shareholders were not party to the forbearance agreement. *See Glass v. United States,* 258 F.3d 1349, 1355 (Fed.Cir. 2001) ("[B]ecause the shareholders did not stand to directly benefit under the contract, they are at most incidental beneficiaries of the contract with no rights to enforce the contract against the United States."). It is now well-established in this Circuit that only parties to an agreement, and in the context of third parties such as shareholders that usually means signatories,[13] may sue for direct breach of contract. *E.g., Anderson,* 344 F.3d 1343, 1351–52; *FDIC v. United States,*

**12.** The facts establish that CFS agents, at the urging of FHLBB, contacted Old NCF, not O. Bruton Smith and Bill Smith individually, about the possibility of a supervisory merger with CFS. The Smiths never saw any of the documents relating to the merger, nor did they participate in any of the Old NCF–CFS negotiations. The Smiths never executed any document in connection with the merger or with the process of obtaining regulatory approval. In fact, O. Bruton Smith admitted during discovery he personally knew of no promise or contract with any regulator associated with the Old NCF–CFS merger. App. Mot. Dismiss Counts Three Through Seven Of Smith Pls.' Second Am. Compl., Cross-mot. For Summ. J. And Opp'n PLS.' Mot. For Partial Summ. J. Vols I–IV (Dec. 1999) at 1370–1405, 1407–1422.

**13.** An exception to this rule is where a party can be considered a third-party beneficiary to the contract. The Federal Circuit, nevertheless, recognizes third-party beneficiary status only as an "exceptional privilege" if the party can "show that [the contract] was intended for his *direct* benefit." *Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir.2001) (citations omitted). The court explained that "specifically, in order to make a shareholder a third party beneficiary, the contract must express the intent of the promissor

to benefit the shareholder *personally, independently of his or her status as a shareholder." Id.* at 1353–54 (emphasis added). *See Castle v. United States,* 301 F.3d 1328, 1338 (2002); *see also Bailey,* 341 F.3d 1342, 1346 (dismissing shareholder's suit for lack of standing). It is clear that under this test the Smith plaintiffs cannot and do not show that the federal regulators in the forbearance agreement intended to specifically benefit the Smiths. To the contrary, however, they argue their claim does *not* depend on their status as third-party beneficiaries. Smith PLS.' Resp. to OSC at 7. As such, any third party beneficiary claim has been effectively waived. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 800 (Fed.Cir.1990) (holding that failure to raise issue in brief constitutes waiver of appeal of the issue); *see also Cubic Defense Systems v. United States,* 45 Fed.Cl. 450, 466–468 (1999) (noting that to permit raising an argument not briefed would contravene notice pleading requirements of modern federal rules of appellate and civil procedure and would condone "litigation by ambush"). Accordingly, without either direct privity or third–party beneficiary status, the Smith shareholders lack standing to sue the government under a breach of contract theory.

342 F.3d at 1319; *Castle v. United States,* 301 F.3d 1328, 1339 (2002).

The Smith plaintiffs' second contract claim—that the government altered its regulations in 1985 for the specific purpose defraying government costs for the potential liquidation of New NCF by duping its shareholders to contribute $3 million by the broken promise of supervisory goodwill—likewise fails for the same reason as the first—a complete absence of any showing of privity of contract between the Smiths and the government. There simply is no evidence in the record of direct or indirect negotiations between the government and the Smiths relating to the $3 million capital infusion. Indeed, there is simply no written or oral evidence as to the existence of an agreement between the government and the Smiths relating to the supervisory goodwill and the forbearance of any capital requirement. Consequently, the Smith plaintiffs fail to meet their burden of establishing standing in their direct contract claims.

2. *Shareholder Derivative Claims*

The Smiths advance shareholder derivative claims as alternate grounds for standing. They make three derivative claims: (1) on behalf of NCF for its loss of a $3 million "capital infusion" in 1985; (2) on behalf of NCF for the lost value of NCF common stock in the wake of NCF''s collapse; and (3) a "general derivative claim" on behalf of all Old NCF and NCF shareholders for $28 million in lost shareholder equity related to the 1982 Old NCF–CFS merger. Pls.' Sec. Am. Compl. at ¶¶ 83–106.

a. *1985 Capital Infusion*

 The Smiths' first argument for derivative standing arises through their purchase of $3 million of preferred stock in New NCF in 1985, Pls.' Sec. Am. Compl. ¶¶ 40, 84. The Smiths were 2 of 72 New NCF shareholders who purchased additional stock in response to the government's regulatory changes that left New NCF with a capital shortfall. *Id.* at ¶ 39. The $3 million of additional New NCF stock, claim the Smiths, allowed New NCF to meet its capital requirements thereby preventing New NCF from falling into receivership. Although this transaction involved New NCF, the Smiths claim derivative status through NCF because of its 1988 reorganization. As a part of that reorganization, the Smiths received one share of NCF stock in exchange for each of their shares of New NCF stock. Since the reorganization, the Smiths maintained their status as shareholders in NCF. Their derivative claim results from the government's breach of contract in the wake of FIRREA. The Smiths claim the government's breach caused NCF to lose the $3 million "capital infusion" without any prospect for recovery or reimbursement. *Id.* The Smiths allege that they, and other similarly situated shareholders, are entitled to restitution of the $3 million they contributed to New NCF in exchange for the preferred stock. *Id.* at ¶ 90.

The defendant contends the Smiths lack standing because they have no hope of recovery under the statutory priority system that gives priority to the government's claims against the receivership.[14] *See* 12 U.S.C. § 1821(d)(11)(A) (2001)(shareholders have statutory property interest in surplus remaining after liquidation of failed thrift only after creditors claims are satisfied).[15] The defendant argues the Smiths would have derivative standing only if they could maximize

---

14. The FDIC, however, unlike defendant, takes no position as to the validity of the $3 million 1985 claim. FDIC's Response to OSC at 2.

15. 12 U.S.C. § 1821(d)(11)(A) (2001) provides: Subject to section 1815(e)(2)(C) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:
(i) Administrative expenses of the receiver.

(ii) Any deposit liability of the institution.
(iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).
(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).
(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

a recovery large enough to survive the priority system. "[S]hareholder plaintiffs advancing derivative claims can do no more than attempt to ensure the largest damages award possible, in the hopes of creating a surplus recovery that will result in distribution to them." Def. Consol. Brf. in Support of Motion to Dismiss for Lack of Standing at 14. The defendant asserts the plaintiffs do not have any hope of recovery because any award they receive of behalf of NCF will necessarily flow to the government under the priority system. As a result, the defendant claims the Smiths do not possess a colorable case or controversy against the United States and must be dismissed for lack of standing. *Id.* at 15; Def's. Consol. Reply in Support of Motion to Dismiss for Lack of Standing at 23–24.

This court agrees with defendant. In *California Hous. Sec., Inc. v. United States,* 959 F.2d 955 (Fed.Cir.1992), the Federal Circuit identified a factual scenario whereby a shareholder possessed derivative standing in a liquidation context. *California Housing* involved a sole shareholder of a failed thrift that sued the government on a Fifth Amendment takings claim. *Id.* at 956. The government argued the shareholder lacked both individual and derivative standing. The Federal Circuit, however, rejected this argument and found that a shareholder would have derivative standing if its complaint "could be construed as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest pursuant to 12 U.S.C. § 1821(d)(11)(B)." *Id.* at 957 n. 2.

The Circuit, following *California Housing,* applied the same analysis in the bankruptcy context in *Branch v. United States,* 69 F.3d 1571 (Fed.Cir.1995). In *Branch,* a bankruptcy trustee acting on behalf of the sole owner of a failed bank sued the United States on a takings claim. *Id.* at 1574. In asserting the failed bank's claims, the trustee described the suit as a shareholder derivative action "on behalf of and in the name of the bank."

*Id.* Based on these facts, the Federal Circuit found that a judgment in the trustee's favor would not only increase the bank's assets, but could also provide a surplus that would benefit the bank's shareholders. *Id.* at 1575. Following *California Housing,* the court found the Court of Federal Claims could entertain the trustee's action because "the complaint could be construed 'as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest.' " *Id.* (quoting *California Housing,* 959 F.2d at 957 n. 2).

While the Federal Circuit has not definitively stated when shareholders possess derivative standing in an actual *Winstar*-related case, various decisions of this court have applied the *California Housing–Branch* analysis.[16] The common thread running through these cases is that shareholders may assert derivative status *only* when there is a reasonable likelihood of a surplus recovery in light of the priority scheme outlined in 12 U.S.C. § 1821(d)(11)(A) (2001). This court agrees.

As stated, the Smiths filed a derivative claim on behalf of NCF to recover the $3 million capital infusion that certain shareholders contributed to New NCF in 1985. Assuming the Smiths prevailed, however, this court finds the Smiths have no plausible, reasonable, or even hopeful chance for a surplus recovery. As of December 31, 2001, NCF owes a staggering $136,396,351 to the United States. Def's. Consol. Brief In Supp. of Motion to Dismiss PLS. for Lack of Standing at 14. Thereafter, the FDIC as receiver would take possession of the $3 million monetary award and distribute it to the United States as creditor in accordance with 12 U.S.C. § 1821(d)(11)(A) (2001). The Smiths as derivative plaintiffs, therefore, do not truly stand adverse to the defendant because they have no hope for a surplus recovery. As a result, this court finds the Smiths lack derivative standing for their 1985

---

**16.** *See FDIC v. United States,* 51 Fed.Cl 265, 272–273 (2001); *Anderson v. United States,* 47 Fed.Cl. 438, 442, n. 3 (2000); *Plaintiffs in All Winstar-Related Cases v. United States,* 44 Fed.Cl. 3, 10–12 (1999).

capital infusion. There simply is no case or controversy here.

### b. *NCF's Common Stock and Lost Old NCF Shareholder Equity*

The Smith plaintiffs' second claim for derivative standing stems from NCF's dramatic loss of value after FIRREA's enactment. NCF's inability to meet its regulatory capital requirements after FIRREA was enacted, the Smiths contend, detrimentally affected NCF's ability to conduct business and caused a massive drop in shareholder value. They trace the loss in value of NCF stock to the government's alleged breach of the forbearance provisions of the 1982 merger between Old NCF and CFS. Pls.' Resp. to OSC at 1. In all, the Smiths allege the government's breach caused NCF a net $28 million loss. Pls.' Sec. Am. Compl., Count Six, ¶ 97.

The Smith plaintiffs' third and final claim for derivative standing stems from their status as shareholders of NCF. Under the heading "General Derivative Claims," the Smiths allege as shareholders of NCF, they "adequately represent the interests of the shareholders similarly situated in enforcing the rights of NCF, New NCF, and Old NCF." Pls.' Sec Am. Compl., Count Seven, ¶ 102. The thrust of this derivative claim proceeds along two different fronts: first, the RTC's alleged failure to assert derivative claims against the United States while the RTC acted as receiver for NCF, and second, the RTC itself "was at fault or partially at fault for causing losses [alleged by the Smiths] ...." Pls.' Sec Am. Compl. ¶ 103. The Smiths ask for restitution of the $28 million in shareholder equity conferred on the United States by virtue of the 1982 Old NCF–CFS merger. Pls.' Sec. Am. Compl. ¶ 106.

The defendant attacks the Smiths' arguments by claiming the Smiths effectively conceded their inability to advance any derivative claim by failing to respond to the defendant's statutory priority argument (discussed immediately above). Def. Consol. Reply In Supp. of Motion to Dismiss Pls. for Lack of Standing at 23. The defendant further faults the final derivative claim in that the Smiths assert it in their capacity as Old NCF shareholders rather than on behalf of NCF, the merged entity. *Id.* at n. 23. The defendant points out that generally, a merger between entities results in the destruction of one company and the emergence of a new company and, therefore, the derivative claim is really asserted on behalf of a defunct entity, Old NCF. *Id.*

The FDIC also attacks the Smiths' derivative claims on standing grounds, but first asks the court to determine if the Smiths possess any direct contract claims against the government. FDIC's Resp. to OSC at 2. The FDIC argues that if the court finds that the Smiths *do not* have any direct claims, but their claims are instead found to be *entirely* derivative, all the claims must be dismissed because the Federal Circuit's *Landmark* line of cases hold that the FDIC as receiver is the successor-in-interest to NCF but lacks standing on case-or-controversy grounds.[17] *Id.* If this court, however, determines the Smiths *do* have standing to assert direct claims, the FDIC argues, this court needs to determine which, if any, of the Smiths' claims are also derivative. *Id.* Any found derivative claim means to the FDIC that they must be joined as an indispensable party and presumably only these claims would be dismissed on *Landmark* grounds. *Id.* at 2–3.

Nevertheless, the FDIC argues that the Smiths' so-called second derivative claim is not a derivative claim at all and was asserted merely as a mechanism to restate their prior claim for personal losses. FDIC's Resp. to OSC at 5. "[The Smiths] are suing for harm sustained directly by the [NCF], with only secondary effects on [the Smiths] themselves, and other stockholders." *Id.*

Furthermore, as to the third and final derivative claim, the FDIC asserts that it can only be brought by FDIC as NCF's successor in interest. *Id.* at 2, 5. Thus, the FDIC claims it is the only party that would have standing to prosecute this claim: "[F]DIC as successor in interest to NC Federal, not [the Smiths], owns any claim for the value of the contributed thrift." *Id.* at 6.

---

**17.** The court discusses the FDIC's standing in Section II.D., *infra.*

■ The court agrees with the defendant and the FDIC. The Smith plaintiffs' second so-called derivative claim is not at all about the loss of value of NCF shares as they contend, but really about recoupment of their personal $28 million contribution to the Old NCF/CFS merger. Clearly, it is not a derivative claim at all because the $28 million in shareholder equity represents contributions from individual shareholders. Any claim for loss of investment value belongs solely to these shareholders as individuals not to all shareholders of the corporation or to the corporation as a *de jure* entity. *See Daily Income Fund v. Fox*, 464 U.S. 523, 528–29, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) ("[T]he term 'derivative action,' ... has long been understood to apply only to those actions in which the right claimed by the shareholder is the one the corporation could itself have enforced in court."). *See also First Hartford Corp. v. United States*, 194 F.3d 1279, 1294 (Fed.Cir.1999)(The derivative shareholder suit device "permits shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation's behalf and for the corporation's benefit.")

Furthermore, defendant's alternative argument is also correct. The Smith plaintiffs' "derivative" claim here for restitution of the $28 million is infirm because it is in reality a claim made on behalf of a defunct corporation—Old NCF. It does not rest directly on the decline of the fair market value of NCF stock due to the government's breach in enacting FIRREA in 1989, but, instead, is predicated upon a tenuous chain of events stemming from the Smiths' initial investment as shareholders to Old NCF and the govern-ment's alleged breach of the original 1982 merger between Old NCF and CFS. Pls.' Sec. Am. Compl. at ¶¶ 59–60, 96–97. The Smiths advance a tenuous "but for" argument:

- but for their $28 million, Old NCF would never have merged with CFS,
- which, in turn, would never have needed supervisory goodwill,
- which then would never have become New NCF,
- which thereafter would never have reorganized to NCF,
- which ultimately would never have suffered from the government's breach via FIRREA.

The problem with this syllogism is that the links in the Smiths' argument break because the chain itself has been corroded by speculation,[18] and because damages for the loss of the value of the contribution, if this really is a derivative claim (which it is not), ultimately would belong to Old NCF, an entity which merged into CFS (which in turn merged into New NCF) and is thus dead as a door knob. It stands to reason that if the corporate entity is deceased any claims asserted on its behalf are likewise moribund. Generally, "[a] merger of two corporations contemplates that one corporation will be absorbed by the other and will cease to exist while the absorbing corporation remains." *Engel v. Teleprompter Corp.* 703 F.2d 127, 131 (5th Cir.1983)(citing *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 331 n. 7, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)).[19] In other words, the Smiths cannot assert a deriva-

18. Generally, damages may not be recovered if too speculative because by definition such damages are not foreseeable by the parties to an agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 351:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
 (a) in the ordinary course of events, or
 (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981); *see also Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed.Cir.2001); *Anchor Sav. Bank, FSB v. United States*, No. 95–39 C, 2003 WL 22415878 at *16 (Fed.Cl. September 29, 2003); *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 552 (2003).

19. Moreover, according to the North Carolina Business Corporation Act, "[w]hen a merger takes effect: [e]very other corporation party to the merger merges into the surviving corporation and the separate existence of every corporation except the surviving corporation *ceases.*"

N.C. GEN. STAT. § 55–11–06(a)(1) (emphasis added).

tive claim on behalf of a company that ceased to exist after a merger.

■ Finally, the Smith plaintiffs' third category of derivative claims, their self-styled "General Derivative Claims," is likewise deficient. Any claim asserted on behalf of NCF belongs to the FDIC as its receiver. "It is beyond dispute that a cause of action arising from an injury to a corporation belongs solely to the corporation, and that shareholders seeking to pursue those damages may only do so on behalf of the corporation, and only if the corporation has failed to do so itself." *Hometown Fin. Inc. v. United States,* 56 Fed.Cl. 477 486 (2003). As a result, courts consistently hold that "shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends." *Id. See also Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 696–97, 1980 WL 13154 (1980). The derivative suit, however, permits shareholders to file suit on behalf of the corporation *only* when no other legal entity for the corporation chooses to do so, or the corporation's legal interests are not adequately represented. *See First Hartford Corp. Pension v. United States,* 194 F.3d 1279, 1295 (Fed.Cir.1999); *AG Route Seven P'ship v. United States,* 57 Fed.Cl. 521, 534 (2003).

■ Simply put, the FDIC as receiver is the successor-in-interest to NCF. *See Castle,* 301 F.3d at 1338–39; *Glass,* 258 F.3d at 1355. It represents NCF in all legal proceedings brought against it, and is charged with administering its debt reduction.[20] The court agrees with the FDIC that the Smith plaintiffs do not allege any claims available to NCF that would not be adequately represented by the FDIC. *See AG Route Seven P'ship v. United States,* 57 Fed.Cl. at 534. As a result, the Smith plaintiffs do not have standing as derivative shareholders under their general derivative claims theory.

### 3. *Fifth Amendment Takings Claim*

■ Lastly, the Smith plaintiffs claim standing under a taking theory. The Smiths assert two theories. The first is based on a taking of the value of their shares, or at least a significant diminution of value of these shares, and a taking of their vested contract rights with passage of FIRREA. In the negotiations, the Smiths claim they, as shareholders of NCF with the ultimate power to approve the merger, relied to their detriment on the government's promises of beneficial treatment of supervisory goodwill. In reliance on this promise, the government "conferred property rights upon [the Smiths] and other shareholders in Old N.C. Federal within the meaning of the Fifth Amendment to the United States Constitution." Pls.' Sec. Am. Compl., at 31, ¶ 80. The Smiths further claim the government intended FIRREA "to effect a taking and ... designed to accomplish that end." *Id.* at 32, ¶ 81. This legislation, moreover, "has taken and condemned the vested contract rights and property of the Plaintiffs ... including the entire value of the stock and attendant corporate rights bargained and sold by contract with the United States ...." *Id.*

The Smith plaintiffs' second takings argument is based on the doctrine of promissory estoppel. According to the Smiths, the government knew its promises relative to supervisory goodwill would induce reasonable reliance on behalf of the Smiths and the other shareholders at Old NCF. If the court finds no contract existed, asserts the Smith plaintiffs, it should imply one as a matter of law via promissory estoppel so the Smiths will not be left without a remedy. Pls.' Resp. to OSC at 7–8; Pls.' Reply to FDIC's OSC Resp. at 3.

■ The court rejects both of the Smiths' takings arguments because the Smiths, as shareholders, simply have no standing to bring a takings claim under the facts of this case. The law of this Circuit is clear: what was taken by the government here was not

---

**20.** The FDIC, as receiver, succeeds to all rights, titles, powers, and privileges of the insured depository institution. 12 U.S.C. § 1821(d)(2)(A) (2001). In this capacity, the FDIC conducts the business of the institution with all of the powers of the shareholders, directors and officers. 12 U.S.C. § 1821(d)(2)(B) (2001). The FDIC may also liquidate the institution "having due regard to the conditions of credit in the locality." § 1821(d)(2)(E) (2001).

the thrift or the shares, but the contractual right to use supervisory goodwill as an asset and for amortization of the asset. *See Bailey v. United States,* 341 F.3d 1342, 1347 (Fed.Cir.2003); *First Hartford Corp.,* 194 F.3d at 1286. Much like the plaintiffs in *Bailey, Glass,* and *Castle,* the Smiths were not parties to the regulatory agreement, "therefore this theory of an alleged taking of the contract is contingent and must be asserted by the FDIC." *Bailey,* 341 F.3d at 1347. *See Glass,* 258 F.3d at 1355; *Castle v. United States,* 301 F.3d 1328, 1338–39 (Fed. Cir.2002). Furthermore, any seizure of a thrift for failure to comply with FIRREA does not constitute a regulatory taking because the Smiths, "through the FDIC, [were] not deprived of a contractual remedy for the government's breach to recover the thrift's assets." *Bailey,* 341 F.3d at 1347 (citing *Castle,* 301 F.3d at 1341, 1342); *Castle,* 301 F.3d at 1342 (enactment of FIRREA "did not deprive the plaintiffs from a contractual remedy ... plaintiffs retained the full range of remedies associated with any contractual property right they possessed.").

While the Smith shareholders do possess a statutory property interest (12 U.S.C. § 1821(d)(11)(A) (2001)) in any liquidation surplus (after payment to creditors in the statutory priority scheme), *Bailey,* 341 F.3d at 1347; *Hartford Corp.,* 194 F.3d at 1287–88, receivership proceeds after liquidation are not available for *derivative* recovery by the Smith shareholders for the reasons stated in Section II.A.(2), *supra.* Only after a surplus in liquidation assets results from a ruling in favor of FDIC may shareholders claim a stake in the remaining proceeds. *Id.; First Hartford Corp.,* 194 F.3d at 1288. However, like the plaintiffs in *AG Route Seven P'ship v. United States,* 57 Fed.Cl. 521, 534 (2003), the Smith plaintiffs do not allege that their statutory interests are compromised, and so have not met their burden

to establish standing on this type of takings claim.

Finally, as alluded to above, this court, like the court in *AG Route Seven P'ship,* declines to adopt a takings claim based on promissory estoppel for the simple reason that the Smith plaintiffs do not possess privity of contract. *See AG Route Seven P'ship v. United States,* 57 Fed.Cl. at 534 n. 31 (rejecting plaintiffs' "fair result" argument as lacking support in case law). This argument is at its heart merely a repetition of their first alleged takings claim clothed in new attire.

### B. *The FDIC's Standing*

■ The FDIC intervened in this matter as the successor in interest to the failed thrift, NCF. The FDIC represents NCF as a receiver, and processes all creditor claims against the thrift in accordance with the statutory priority scheme.[21] The FDIC intervened in this case, as well as 40 other *Winstar* cases, because "shareholder plaintiffs were asserting claims belonging to failed thrifts." FDIC's Resp. to OSC at 3; *see Plaintiffs In All Winstar–Related Cases,* 41 Fed. at 12. Here, the FDIC alleges the Smiths attempted to subvert the receivership priority system by filing their own derivative claims on behalf of NCF. The FDIC argues that as NCF's successor in interest, all claims relating to NCF's collapse belong to the FDIC only.

As mentioned above, the FDIC offers an analytical framework for analyzing its standing relative to Smiths' standing. The FDIC contends this court cannot apply the *Landmark* test (*See Landmark Land Co.,* 256 F.3d 1365 (Fed.Cir.2001)) until the court determines if the Smiths possess any direct contract claims against the government. If the Smiths do not have any direct claims, then their other claims must necessarily be derivative and neither the Smiths nor the FDIC would possess standing. If this court,

---

21. When NCF failed, the government appointed the Resolution Trust Corporation ("RTC") as NCF's receiver. The RTC satisfied NCF's insured outstanding deposit liabilities. After paying these liabilities, the RTC subrogated by law to the rights of NCF's depositors against the thrift. 12 U.S.C. § 1821(g); *see* 12 U.S.C. 1441a(b)(4)(A) (applying 12 U.S.C. § 1821(g) to

the RTC), and 12 C.F.R. § 360.3. These claims eventually passed to the FSLIC Resolution Fund ("FRF") when the RTC ceased to exist. 12 U.S.C. § 1441a(m)(2). The FDIC administers the FRF and prepares a yearly statement that outlines the exact amount receiverships owe the FRF in subrogated claims. *See also* n. 12, *supra.*

however, determines the Smiths do have standing to assert their personal claims, then this court needs to determine if the Smiths' claims are essentially derivative. Any derivative claims means the FDIC must be joined as an indispensable party.

The Smith plaintiffs counter the FDIC's assertions with accusation that the FDIC's arguments are "not only incorrect but irrelevant." Pls.' Reply to FDIC's OSC Resp. at 1. The Smiths claim their derivative standing rests not on a damages claim for loss in value of NCF's stock, but on an equitable claim for restitution to recover the value of the benefit given to CFS in the merger. *Id.* The Smith plaintiffs also contend that if this court grants the FDIC standing they would be left without a remedy because the FDIC is required by statute to return any recovery to the United States. In the Smiths' words, "[t]his is not permitted by the *Winstar* line of cases, or by the Fifth Amendment, or by relevant general case law." *Id.* at 3.

Defendant does not offer a reply to the Smith plaintiffs' arguments and concentrates solely on the FDIC's claims for standing. Defendant agrees with the FDIC on one important point: the FDIC ultimately lacks standing. "The FDIC's response is correct on one important point: If shareholder plaintiffs lack privity to assert direct contract claims, then all plaintiffs' contract claims must be dismissed now." Pls.' Reply to FDIC's OSC Resp. at 26. Defendant argues the FDIC's proposed analysis for derivative standing is nothing more than a smoke screen designed to conceal the fundamental message—the FDIC lacks standing under the authority in this Circuit and the court should evaluate it separately from the Smiths' standing.

This court agrees. This issue has been resolved since *Landmark*. In *Landmark*, the FDIC intervened as a successor in interest on behalf of a failed thrift whose shareholders sued the United States for breach of contract. The court awarded the FDIC $17.7 million dollars in restitution, finding it to be the value of the benefit the failed thrift conferred on the government.

On appeal, the Federal Circuit focused on the discrepancy between the total amount of the government's claim against the total amount of the FDIC's recovery. "Even if the FDIC were to have won a judgment for the entire amount it was seeking, however, none of the money paid by the government in satisfaction of such a judgment would leave the government." *Landmark,* 256 F.3d at 1380. Consequently, no real adversity existed under the facts of the case between the FDIC and the government.

As a result, the FDIC did not possess standing because its damage claim against the United States did not constitute an Article III case or controversy since the amounts claimed were not in excess of what the thrift in this case owed the government. "[W]here the FDIC has not asserted claims for recovery in excess of what the failed thrift owes the government, the case-or-controversy requirement is not satisfied." *Landmark Land Co.,* 256 F.3d at 1382. *See Admiral Financial Corp. v. United States,* 329 F.3d 1372 (Fed.Cir.2003)("the critical question is whether claims being asserted by the FDIC and claims being asserted by the plaintiff . . . total less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift. If they do, the case-or-controversy requirement is not met and the FDIC lacks standing."). Simply put, the FDIC is not truly adverse to the government unless and until its own claim asserted on behalf of the thrift surpasses the amounts owed by the thrift to the government, which are primarily the insured outstanding deposit liabilities.

In this case, the FDIC and the United States are engaged in an intergovernmental dispute rather than a genuine Article III "case or controversy." As of December 31, 2001, the unpaid principal balance of the NCF receivership deficit is $136,396,351. Def.'s Consol. Brf. In Supp. of Motion to Dismiss Pls. for Lack of Standing at 14; Def.'s Proposed Findings of Uncontroverted Facts at ¶¶ 54–55. As of December 31, 2002, the FDIC's claims total $41.7 million. FDIC's Resp. to OSC, Ex. A, Rep. 3. Accordingly, pursuant to the *Landmark–Admiral* rationale, the FDIC lacks standing because its claims, even if coupled with the claims of the Smith plaintiffs, do not exceed the

amount the NCF remains in arrears to the United States. As a result, the court finds the FDIC lacks standing to sue on its claim.

### III. Conclusion

For the foregoing reasons, the Smith plaintiffs and the FDIC each lack standing to assert their respective claims against the United States. As a result, the Clerk of the Court is directed to enter judgment in favor of the United States. All other pending motions, being moot, are hereby DENIED.

IT IS SO ORDERED.